## Exhibit B

**Boriack Deposition Transcript**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

In re:                          :   CHAPTER 11 (SUBCHAPTER V)
                                :
PORT ARTHUR STEAM               :   CASE NO. 21-60034
ENERGY, LP                      :
                                :
        Debtor.                 :

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RULE 2004 EXAMINATION OF
CORPORATE REPRESENTATIVE OF
PORT ARTHUR STEAM ENERGY, LP

TED BORIACK

JUNE 16, 2021

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THE RULE 2004 EXAMINATION OF TED BORIACK,

produced as a witness at the instance of the Creditor,

Oxbow Calcining LLC, and duly sworn, was taken in the

above-styled and numbered cause on the 16th day of

June, 2021, from 11:30 a.m. to 2:05 p.m., before Andrea

L. Desormeaux, CSR in and for the State of Texas,

reported by machine shorthand, at the offices of Baker

Botts, 910 Louisiana Street, Houston, Texas, pursuant

to the Federal Rules of Bankruptcy Procedure and the

provisions stated on the record or attached hereto.

2

```
1                    A P P E A R A N C E S

2

3    FOR THE CREDITOR OXBOW CALCINING, LLC:

4        Mr. Kevin T. Jacobs
         Mr. Michael S. Goldberg
5        Mr. David R. Eastlake
         Baker Botts, LLP
6        3000 One Shell Plaza
         910 Louisiana Street
7        Houston, Texas 77002-4995
         Phone: (713) 229-1947
8        kevin.jacobs@bakerbotts.com
         michael.goldberg@bakerbotts.com
9        david.eastlake@bakerbotts.com

10

     FOR THE DEBTOR PORT ARTHUR STEAM ENERGY, LP:
11
         Mr. Johnie J. Patterson, II
12       Walker and Patterson, PC
         4815 Dacoma Street
13       Houston, Texas 77092
         Phone: (713) 956-5577
14       jjp@walkerandpatterson.com

15

16

17

18

19

20

21

22

23

24

25
```

```
1                            INDEX

2    Stipulations ...................................    1
     Appearances ....................................    2
3
     TED BORIACK
4
            Examination by Mr. Jacobs .............    4
5
     Changes and Signature ..........................   86
6    Reporter's Certificate .........................   88

7                          EXHIBITS

8    NO./DESCRIPTION                                   PAGE

9        No. 4 ......................................   24
           Port Arthur Steam Energy, LP Balance Sheet
10         as of April 12, 2021
           No. 6 ......................................   67
11         Chapter 11 (Subchapter V) Plans
           No. 8 ......................................   35
12         Monthly Operating Report for Small Business
           Under Chapter 11
13         No. 31 .....................................   56
           January - April 2021 Port Arthur Steam
14         Energy's LP General Ledger; PASE002073 -
           PASE002079
15         No. 38 .....................................   61
           12/23/20 e-mail from Nate Belden to Ted
16         Boriack; PASE002042

17                   PREVIOUSLY MARKED EXHIBITS

18   NO./DESCRIPTION                                   PAGE

19       No. 1 ......................................    5
           Notice of Rule 2004 Examination of Port
20         Arthur Steam Energy, LP's Corporate
           Representative and Subpoena Duces Tecum
21         No. 3 ......................................   11
           Official Form 201, Voluntary Petition for
22         Non-individual's Filing for Bankruptcy
           No. 53 .....................................   62
23         Port Arthur Steam Energy, LP Financial
           Statements; PASE002280 - PASE002295
24

25
```

```
 1                        TED BORIACK,
 2    having been first duly sworn, testified as follows:
 3                        EXAMINATION
 4    BY MR. JACOBS:
 5         Q.   Tell us your full name, please.
 6         A.   Ted Boriack.
 7         Q.   What's your understanding of why you're here
 8    today, sir?
 9         A.   To be deposed.
10         Q.   How are you currently employed, Mr. Boriack?
11         A.   I work as a partner in Integral Power.  And we
12    have a management agreement with Port Arthur Steam
13    Energy to manage the asset, the Port Arthur plant.  And
14    that's -- you know, basically self-employment.
15         Q.   Are you the managing partner for Integral
16    Power?
17         A.   Well, my partner, Mr. Deyoe -- we have
18    equivalent positions in Integral Power.  We're 50/50
19    owners, joint owners, I guess you could say.
20         Q.   Are you employed in any other capacity today,
21    sir?
22              MR. PATTERSON:  Come on.  I told you
23    we're not going to do this.  Move on and stick to the
24    debtor.  We're not going to get into their personal
25    lives.  We're not going to do it, as much as you want
```

Ted Boriack - June 16, 2021                    5

11:31:57  1    to.

11:31:57  2                    (Previously Marked Exhibit No. 1.)

11:31:57  3        Q.   (By Mr. Jacobs)  Let's take a look at Exhibit

11:32:00  4    No. 1, sir.  If you will turn to page 13, please.

11:32:25  5                    Are you with me?

11:32:26  6        A.   Okay.  Thirteen.

11:32:28  7        Q.   Exhibit No. 1 is the notice for today's

11:32:33  8    deposition.  Do you see that, sir?

11:32:36  9        A.   Where is 1?  This No. 1 at the top?  Is that

11:32:45 10    what you're saying?

11:32:46 11                    MR. PATTERSON:  He doesn't know where he

11:32:47 12    sent you already.  You told him to turn to 13 and now

11:32:50 13    you're asking him about the notice.

11:32:52 14        Q.   (By Mr. Jacobs)  Why don't you start on the

11:32:54 15    first page, sir.

11:32:55 16                    MR. PATTERSON:  Because you told him to

11:32:56 17    go to page 13.

11:33:00 18        Q.   (By Mr. Jacobs)  Exhibit No. 1.  This is the

11:33:02 19    notice for today's examination, correct?

11:33:04 20        A.   Okay.  I see this Exhibit 1 document.

11:33:07 21        Q.   Okay.  And this document is the notice for

11:33:10 22    today's Rule 2004 Examination of the Debtor PASE.  Do

11:33:17 23    you see that?

11:33:17 24        A.   Okay.  I see it.

11:33:19 25        Q.   Okay.  And now let's go to page 13.  And you

Ted Boriack - June 16, 2021                         6

11:33:31  1   understand that there were 16 topics for examination

11:33:34  2   today.  Agreed?

11:33:35  3        A.   I see.

11:33:36  4        Q.   Okay.  And Mr. Deyoe has some topics and you

11:33:41  5   have some topics and Mr. Belden has some topics, right?

11:33:50  6        A.   Yes.

11:33:50  7        Q.   Can you identify for me your topics?

11:33:52  8        A.   I believe I had 2, 3, 4, 5, 6.  And I think

11:34:11  9   there's another one in there but...

11:34:16 10                  MR. PATTERSON:  Fourteen.

11:34:18 11        A.   Fourteen.

11:34:18 12        Q.   (By Mr. Jacobs)  Okay.

11:34:20 13        A.   Right.

11:34:20 14        Q.   For your topics, what did you do to prepare

11:34:23 15   yourself to testify for today, sir?

11:34:25 16        A.   I just reviewed the related information

11:34:33 17   associated with the topic.

11:34:34 18        Q.   Okay.  What information did you review?

11:34:38 19        A.   Like the -- the financials that we had

11:34:48 20   produced.

11:34:51 21        Q.   PASE's financial statements.  Balance sheets

11:34:58 22   as well?

11:34:58 23        A.   Yeah, I would consider that to be in the same

11:35:01 24   category.

11:35:01 25        Q.   Okay.  What else did you review, sir?

Ted Boriack - June 16, 2021                          7

```
11:35:03  1        A.    Some general ledgers.

11:35:09  2        Q.    Okay.

11:35:21  3        A.    And I don't know if I got the document right,

11:35:25  4   but that document (indicating).

11:35:28  5        Q.    By "that document," you're referring to

11:35:33  6   Exhibit No. 3 that's in front of you, sir?

11:35:35  7        A.    Yeah, I believe so.

11:35:37  8        Q.    Okay.  Did you review anything else,

11:35:42  9   Mr. Boriack?

11:35:42 10        A.    Probably.  I'm just -- you know, I don't have

11:35:45 11   a -- I don't have an exact listing of everything I

11:35:48 12   looked at.

11:35:49 13        Q.    Well, do you have a memory of other things

11:35:52 14   that you looked at?

11:35:56 15        A.    Everything I looked at?

11:35:58 16        Q.    Sure.

11:35:59 17        A.    No.  Just like I said, I don't have an exact,

11:36:01 18   you know, listing; in other words, a total recall of

11:36:04 19   everything I looked at.  I looked over a number of

11:36:08 20   things but they were, you know, associated with this.

11:36:11 21        Q.    We've got financials, balance sheet, general

11:36:16 22   ledgers, Exhibit No. 3 in front of you.  Is there

11:36:18 23   anything else that you recall?  What else do you recall

11:36:24 24   reviewing in preparation for your testimony today?

11:36:26 25                  MR. PATTERSON:   Objection; asked and
```

| | |
|---|---|
| 11:36:29 | 1 |

11:36:29  1    answered.  Argumentative.

11:36:31  2        A.   Yeah, I reviewed the documents that are

11:36:34  3    related to this -- to this matter.  And so -- and I had

11:36:38  4    this list of these 16 items and the items that were --

11:36:44  5    that I was going to address.  And so I looked over

11:36:51  6    those associated documents that relate to those items

11:36:53  7    on the list.  And so, you know, naming each and every

11:36:58  8    exact document, I don't -- you know, I don't know about

11:37:00  9    that.  But I know that I looked over a number of

11:37:03 10    documents, and they're the ones that, you know, we had

11:37:05 11    produced and -- and the filing information.

11:37:07 12        Q.   (By Mr. Jacobs) Are there other categories of

11:37:11 13    documents, types of documents, that you remember

11:37:14 14    looking at?

11:37:15 15             MR. PATTERSON:   Objection; asked and

11:37:19 16    answered and argumentative.

11:37:20 17        A.   I don't know how many more times I can answer

11:37:27 18    this.  I just keep -- you know, we're going in a circle

11:37:30 19    here.

11:37:30 20        Q.   (By Mr. Jacobs)  One of the things that you

11:37:31 21    mentioned were financials.  Did you review any

11:37:34 22    financials prepared by outside auditors?

11:37:43 23        A.   I know that we produced some financials from

11:37:49 24    outside auditors; and at the time those were prepared,

11:37:54 25    I looked them over.  I have not reviewed them just, you

11:38:00  1   know, recently ahead of this deposition today.

11:38:02  2       Q.   The last financial statements I saw in the

11:38:05  3   production were by Briggs & Veselka for the year ended

11:38:13  4   2018.

11:38:13  5       A.   Okay.

11:38:14  6       Q.   Are you aware of any outside auditor firms

11:38:16  7   that have audited PASE's financials for 2019?

11:38:24  8            MR. PATTERSON:   Objection; assumes facts

11:38:25  9   not in evidence and form and argumentative.   And

11:38:32 10   relevance.   Nobody cares about the last thing that you

11:38:35 11   saw.   So just ask him a direct question.   He can't

11:38:38 12   comment on what you saw or what you know.

11:38:41 13       Q.   (By Mr. Jacobs) Mr. Boriack, were PASE's

11:38:45 14   financials audited by an outside accounting firm for

11:38:50 15   2019?

11:38:50 16       A.   No.

11:38:50 17       Q.   What about for 2020?

11:38:52 18       A.   No.

11:38:52 19       Q.   Why not for 2019?

11:38:54 20       A.   Well, Oxbow shut down our plant and we had no

11:39:04 21   stream revenue.   The total shutdown was in June of

11:39:08 22   2018.   And so in January 2019, we had a mass layoff;

11:39:18 23   the vast majority of our folks were gone.   And so in

11:39:22 24   2019, the financials became very simple.   We didn't

11:39:27 25   have any steam revenue.   The payroll, all of that was

Ted Boriack - June 16, 2021                          10

11:39:35  1   way, way down.  And so it got down to very simple

11:39:40  2   financials.  And then there's the cost of an audit

11:39:48  3   which is very expensive.  So we got down to the point

11:39:51  4   where financially it didn't -- there wasn't -- it

11:39:55  5   wasn't really -- it wasn't really practical to continue

11:39:58  6   to have an expensive audit when the financials became

11:40:02  7   so very simple relative to what they were during full

11:40:04  8   operation.

11:40:05  9        Q.   What's an expensive audit?

11:40:08  10       A.   You know, 30-plus thousand dollars.  Something

11:40:10  11  like that.

11:40:10  12       Q.   If I were to ask you about 2020, why there

11:40:15  13  were no financials audited by an outside firm for 2020,

11:40:19  14  would your answer be the same?

11:40:21  15       A.   Right, yeah.  By 2020, I mean, that was the

11:40:26  16  year we've -- you know, there was no power delivery to

11:40:31  17  that -- power delivery to Oxbow was shut down.  And our

11:40:41  18  last -- we had two employees that were part-timers on

11:40:44  19  payroll but we shut down the payroll service and it

11:40:48  20  became even more reduced.  So it just didn't -- it was

11:40:57  21  a big expenditure relative to the size of the -- you

11:41:00  22  know, the financial data associated with it.

11:41:02  23       Q.   Who made the decision not to have an outside

11:41:07  24  firm do an audit for 2019 to '20?

11:41:13  25       A.   It was, you know, confirmed by AIP, you know,

11:41:26  1   that -- that it wouldn't be required.  You know, it's

11:41:34  2   just very expensive and the financials became very,

11:41:37  3   very simple.

11:41:38  4       Q.   Was it your and Mr. Deyoe's idea not to do it?

11:41:46  5       A.   I don't know if I could say that.  I think it

11:41:53  6   was something that was just -- it just came up along

11:41:58  7   with other -- you know, what else can we do to conserve

11:42:06  8   cash, things that were done.

11:42:08  9       Q.   And the things that were done to preserve

11:42:10 10   cash, those were things that you and Mr. Deyoe were

11:42:12 11   coming up with and implementing, correct?

11:42:16 12       A.   Right.  As, you know, just looking over the

11:42:19 13   plant and being an asset manager, you conserve cash

11:42:31 14   however you can.

11:42:33 15       Q.   Who from AIP authorized it?  You said they

11:42:42 16   confirmed it.  Who was it?

11:42:43 17       A.   That would have been either Nate or John Ryan.

11:42:54 18       Q.   By "Nate," you mean Nate Belden?

11:42:59 19       A.   Yeah, Nate Belden.

11:43:05 20            (Previously Marked Exhibit No. 3.)

11:43:05 21       Q.   Okay.  If you'll take Exhibit No. 3.  It's

11:43:07 22   right in front of you.  It's right here.  I'm done with

11:43:09 23   Exhibit No. 1 for now.

11:43:10 24       A.   I can put this aside?

11:43:11 25       Q.   Yes, sir.

11:43:24  1         I'd like to take you -- at the top of

11:43:26  2  Exhibit No. 3, it says pages 1, 2, 3, 4 of 37.  Do you

11:43:32  3  see that?  Top right.

11:43:37  4         A.   Okay.

11:43:43  5         Q.   Let's go to page 19 of 37, sir.  I want to ask

11:43:54  6  you questions about Schedules E and F which talk about

11:44:00  7  creditors who have unsecured claims of the Debtor PASE.

11:44:03  8  Are you with me?

11:44:04  9         A.   Okay.

11:44:05 10         Q.   The first one that is listed is the Internal

11:44:08 11  Revenue Service.  Do you see you that?

11:44:11 12         A.   I do.

11:44:12 13         Q.   And obviously, that's for taxes; and there's a

11:44:15 14  total claim of unknown and a priority claim of unknown.

11:44:19 15  Do you see that?

11:44:21 16         A.   I do.

11:44:22 17         Q.   As you sit here today, has PASE prepared its

11:44:29 18  tax return for 2020?

11:44:30 19         A.   No, it has not.  It's -- it's in the works.

11:44:36 20         Q.   Who is preparing PASE's tax return?

11:44:46 21         A.   Our tax return is usually done by BDO.

11:44:54 22  They've done it over -- for the last however many

11:44:57 23  years.  And so they're currently reviewing it, you

11:45:06 24  know, I guess given the Chapter 11 status.  And so it's

11:45:16 25  been kicked off but it's not been completed yet and

Ted Boriack - June 16, 2021                              13

11:45:23  1   so...

11:45:24  2        Q.   Are you aware of an estimate for what the 2020

11:45:27  3   tax liability will be for the Debtor PASE?

11:45:31  4        A.   Yeah, I would have to -- I would have to lean

11:45:34  5   on the tax -- on the tax guys to respond to that.

11:45:41  6        Q.   When's the last time you talked with BDO about

11:45:44  7   the 2020 tax return?

11:45:46  8        A.   It's probably been about -- maybe it's been

11:45:59  9   about a week or two.

11:46:01 10        Q.   What's your estimate for when the tax return

11:46:04 11   will be completed?

11:46:05 12        A.   I don't have an estimate at this time.  I

11:46:07 13   would have to follow up with BDO.

11:46:09 14        Q.   Who at BDO?

11:46:10 15        A.   Brandon Pollard is our usual contact.

11:46:18 16        Q.   2.2 lists the Jefferson Central Appraisal

11:46:23 17   District, and that's for property tax.  Do you see

11:46:27 18   that?

11:46:27 19        A.   Yes.

11:46:27 20        Q.   Is that for PASE's property in Port Arthur,

11:46:32 21   Texas?

11:46:32 22        A.   Yes.

11:46:33 23        Q.   Okay.  Has PASE received its assessment and

11:46:37 24   estimate for property taxes?

11:46:39 25        A.   Well, the last one we received, I believe, is

Ted Boriack - June 16, 2021                    14

11:46:46   1    for 2020, and it was zeroed.  So we are not expecting a

11:46:54   2    tax bill.  But, you know, it's one of those things;

11:47:00   3    it's a governmental entity and, you know --

11:47:06   4         Q.    When you say zero --

11:47:04   5         A.    We'll see what comes.

11:47:06   6         Q.    I did not mean to interrupt you.

11:47:09   7               When you say "zeroed," what do you mean

11:47:12   8    by that?

11:47:12   9         A.    Like on the valuation that I -- that I sent,

11:47:16  10    but they've closed the account.  But that's what they

11:47:18  11    do when you're -- when you've been shut down and you

11:47:20  12    have no revenue.  They don't continue to tax the entity

11:47:22  13    when they have no income.

11:47:26  14         Q.    And so that happened for 2020?

11:47:28  15         A.    That's as I recall, yes.

11:47:31  16         Q.    Did it happen for 2019?

11:47:33  17         A.    No, I believe in 2019 -- I'd have to go back

11:47:38  18    and look; but we, you know, produced the tax documents.

11:47:44  19         Q.    Is it your expectation that that will be the

11:47:46  20    case for 2021 as well?

11:47:50  21         A.    That's what I would expect to happen, but I

11:47:54  22    have not heard anything otherwise.  I have not -- I

11:47:58  23    have not talked to the appraisal district in a while.

11:48:01  24         Q.    If you will turn to the next page, sir.  The

11:48:14  25    reference there to BDO, do you see that?

Ted Boriack - June 16, 2021                    15

11:48:16  1        A.    I do.

11:48:17  2        Q.    And there is an amount of a claim of $12,000.

11:48:21  3   Do you see that?

11:48:21  4        A.    I do.

11:48:22  5        Q.    What's the basis for that $12,000?

11:48:24  6        A.    That would be for preparation of the tax

11:48:28  7   return for 2020.

11:48:30  8        Q.    And that has not been paid?

11:48:34  9        A.    No, not yet.

11:48:35 10        Q.    Is there an invoice associated with that or a

11:48:42 11   statement from BDO?

11:48:47 12        A.    Yeah, I don't -- I don't believe so.

11:48:49 13        Q.    So what's the basis for the $12,000?

11:48:53 14              MR. PATTERSON:  Objection; asked and

11:48:54 15   answered, plus it's right there on the paper.  "Basis

11:48:58 16   for the claim:  Accounting services."

11:49:08 17        Q.    (By Mr. Jacobs)  What's the basis for the

11:49:09 18   amount?

11:49:10 19              MR. PATTERSON:  Objection; asked and

11:49:12 20   answered.  He literally has answered this twice.

11:49:14 21   Literally.

11:49:15 22              MR. JACOBS:  No, he hasn't.

11:49:17 23              MR. PATTERSON:  And this is so

11:49:18 24   inconsequential.  I mean, do you really -- we're going

11:49:21 25   to go through each of these and say, "Does it say this?

Ted Boriack - June 16, 2021                          16

11:49:24  1    Is this what it says?"  Come on.  It's ridiculous.

11:49:29  2         Q.   (By Mr. Jacobs)  Is there an invoice for

11:49:32  3    $12,000?

11:49:33  4         A.   No.

11:49:36  5         Q.   I'm just asking:  What is the grounds, the

11:49:43  6    reason, for the $12,000 amount that is listed there?

11:49:48  7         A.   Well, every year they invoice an amount and

11:49:51  8    it's -- you know, I don't know what they were --

11:49:57  9    exactly what they're going to bill, but it would be in

11:50:00 10    that neighborhood.

11:50:00 11         Q.   What did they bill in 2019?

11:50:02 12         A.   I don't know exactly.  But it's not -- it's in

11:50:10 13    that ballpark.  It's somewhere in that area.

11:50:12 14         Q.   And then the next item is the Dunn & Neal law

11:50:22 15    firm.  Do you see that?

11:50:22 16         A.   Yes, I do.

11:50:22 17         Q.   And it's listed here as having unsecured

11:50:25 18    claims, but the amount of its claim is listed at zero

11:50:30 19    dollars.  Do you see that.

11:50:30 20         A.   I see that.

11:50:31 21         Q.   So why is Dunn & Neal listed if the amount of

11:50:37 22    its claim is zero dollars?

11:50:39 23              MR. PATTERSON:  Objection; calls for a

11:50:41 24    legal conclusion and relevance.

11:50:56 25         Q.   (By Mr. Jacobs)  You may answer, sir.

CONTINENTAL COURT REPORTERS, INC.
(713) 522-5080

Ted Boriack - June 16, 2021                        17

11:50:57  1      A.   Well, I guess they're -- these -- well, I
11:51:21  2  mean, they're -- we received an invoice in May.  I
11:51:33  3  don't know.  I'd have to think about the timing of the
11:51:36  4  invoices.  But I know they have a -- there's an invoice
11:51:42  5  that's been submitted, but I don't -- I don't recall
11:51:46  6  the amount.  But I believe it came in after -- after
11:51:50  7  all this, so -- after the filing date.
11:51:55  8      Q.   Okay.
11:51:56  9      A.   So I'm not -- I'm not quite sure on the
11:52:00 10  particulars on that one, on the amount.
11:52:02 11      Q.   Okay.  Integral Power is listed next and also
11:52:08 12  has zero dollars for the amount of its claim.  Can you
11:52:12 13  explain why it's listed if the amount of its claim is
11:52:15 14  zero dollars?
11:52:16 15               MR. PATTERSON:   Objection; calls for a
11:52:18 16  legal conclusion, argumentative.
11:52:26 17      A.   I'm not -- I'm not quite sure on the -- I
11:52:31 18  don't know -- the filing date versus when the -- when
11:52:33 19  the amounts are due and -- and how that is determined.
11:52:42 20  But I am not an attorney, so...
11:52:47 21      Q.   (By Mr. Jacobs)  3.4 on page 20 of Exhibit 3
11:52:52 22  lists McMahan & McMahan.  And it lists accounting
11:52:58 23  services, right?
11:52:59 24      A.   Correct.
11:52:59 25      Q.   What services does McMahan & McMahan provide

Ted Boriack - June 16, 2021                           18

11:53:06  1    that are not provided by BDO?  What's the difference?

11:53:09  2         A.    BDO is a tax firm.

11:53:11  3         Q.    Okay.

11:53:12  4         A.    But we used them for tax.  And McMahan &

11:53:15  5    McMahan are just monthly bookkeepers, and they run the

11:53:20  6    QuickBooks.

11:53:20  7         Q.    How long have they run the books for, sir?

11:53:25  8         A.    For about a year, maybe.  About that long.

11:53:28  9         Q.    Who did it before then?

11:53:29 10         A.    We had our plant accountant, Becky Sanders.

11:53:35 11         Q.    Okay.

11:53:37 12         A.    Rebecca Sanders, I should say.

11:53:39 13         Q.    And for McMahan & McMahan, there's an amount

11:53:42 14    of claim that's listed at $12,000.  My question to you

11:53:46 15    is:  What's the basis for the $12,000 figure?

11:53:50 16         A.    I think that amount would actually be a lesser

11:53:59 17    amount.  I mean, his -- his monthly bill is, you know,

11:54:04 18    a couple, $300 or so, maybe -- you know, maybe in

11:54:09 19    between there.  But if -- you know, if we exercise and,

11:54:15 20    you know, he could have charged -- you know, if it's

11:54:17 21    something outside of just usual monthly bookkeeping, I

11:54:22 22    suppose he could have an additional fee.  But that's

11:54:25 23    along those lines.

11:54:28 24         Q.    How many months had -- I mean, if any -- had

11:54:32 25    he not been paid prior to the bankruptcy filing of

Ted Boriack - June 16, 2021                    19

| | | |
|---|---|---|
| 11:54:35 | 1 | April 14th? |
| 11:54:37 | 2 | A.   I'm not sure exactly.  Maybe a couple. |
| 11:54:54 | 3 | Q.   All right.  Go to the next page.  There's a |
| 11:54:58 | 4 | listing there of Oxbow for a lease agreement.  Do you |
| 11:55:01 | 5 | see that? |
| 11:55:01 | 6 | A.   I do. |
| 11:55:02 | 7 | Q.   Just so I'm clear, what lease agreement are we |
| 11:55:07 | 8 | talking about here? |
| 11:55:28 | 9 | A.   I believe that would be the lease agreement |
| 11:55:44 | 10 | for the PASE property, for the -- for the -- for the |
| 11:55:49 | 11 | land on which the PASE assets reside. |
| 11:55:55 | 12 | Q.   And there's an agreement that governs that, |
| 11:55:58 | 13 | right? |
| 11:55:58 | 14 | A.   Right.  It was in the Heat Energy Agreement. |
| 11:56:02 | 15 | Q.   What is the monthly or annual lease payment |
| 11:56:08 | 16 | specified in the agreement between Oxbow and PASE? |
| 11:56:11 | 17 | MR. PATTERSON:  Objection.  It's not the |
| 11:56:16 | 18 | best evidence.  If he wants to know what it is, it's in |
| 11:56:20 | 19 | the agreement. |
| 11:56:22 | 20 | A.   Yeah, it's, of course, spelled out in the -- |
| 11:56:25 | 21 | in the Heat Energy Agreement.  It's an exhibit to the |
| 11:56:31 | 22 | energy agreement, and it's approximately 10 percent of |
| 11:56:34 | 23 | the -- of the billing that Oxbow is charged by Kansas |
| 11:56:47 | 24 | City Southern Railroad. |
| 11:56:48 | 25 | Q.   (By Mr. Jacobs)  When's the last time that |

11:56:51  1    PASE made a lease payment to Oxbow?

11:56:54  2        A.   As I recall, that is the payment that was

11:57:04  3    worked as a credit against the power bill for January

11:57:14  4    of 2020.  And there was some kind of an offset

11:57:21  5    arrangement.  And then subsequent to that, Oxbow

11:57:27  6    refused to pay the February, March and April power

11:57:32  7    bills and make those payments to PASE.  And I believe,

11:57:37  8    you know, this has been in dispute now.

11:57:38  9        Q.   Let me make sure.  I think I understand your

11:57:42 10    testimony.

11:57:43 11             Your testimony is that in the past, PASE

11:57:47 12    would bill -- send Oxbow an electric bill, right?

11:57:51 13    Let's say it was for $50,000, right?

11:57:56 14        A.   Okay.

11:57:57 15        Q.   And at the same time, PASE would owe Oxbow

11:58:03 16    money for the sublease.  True?

11:58:06 17             MR. PATTERSON:   Objection; calls for a

11:58:08 18    legal conclusion.

11:58:10 19        A.   Well, when we were able to operate and if we

11:58:20 20    had revenue, we would send power bills to Oxbow and

11:58:24 21    they would send us lease invoices.

11:58:28 22        Q.   (By Mr. Jacobs)  Okay.

11:58:29 23        A.   And they were paid as individual -- you know,

11:58:35 24    as the invoices arose, then they were paid.

11:58:38 25        Q.   So they were not offset.  PASE would pay --

11:58:42 1        A.    Not -- not typically.

11:58:44 2        Q.    Okay.  But since January of 2020, Ox- -- PASE,

11:58:53 3   excuse me.  PASE has offset the electric bills that

11:58:57 4   were unpaid, against the lease payments that have --

11:59:03 5   that PASE owes Oxbow?

11:59:06 6        A.    That's not what I said.

11:59:07 7        Q.    Okay.  So here's my -- I'm going to ask a very

11:59:11 8   simple question.  For any month in 2021 -- January,

11:59:16 9   February, March, April -- has PASE made a lease payment

11:59:22 10  to Oxbow?

11:59:23 11       A.    Not that I can recall.

11:59:28 12       Q.    The same question for the months in 2020.  Did

11:59:32 13  PASE make sublease payments to Oxbow for the months of

11:59:37 14  January through December 2020?

11:59:43 15       A.    Well, there was a payment made in January of

11:59:46 16  2020, effectively, the value of the payment being made

11:59:54 17  on this credit that was worked out in January of 2020

11:59:59 18  for some amount of rent payment against some power

12:00:08 19  bill, the January power bill.

12:00:11 20       Q.    And is that offset reflected somewhere in a

12:00:21 21  financial statement or a P&L or some kind of a general

12:00:26 22  ledger that PASE has?

12:00:26 23       A.    Yeah.  I believe it showed in the -- I

12:00:29 24  haven't -- I haven't looked at it recently, but I

12:00:35 25  recall that we made the effort on the accounting to try

Ted Boriack - June 16, 2021                    22

12:00:41  1    to get that reflected correctly.

12:00:41  2        Q.    I'll see if --

12:00:44  3        A.    But it's not a usual entry.

12:00:47  4        Q.    All right.  I'll see if we can locate that and

12:00:50  5    confirm it.

12:00:51  6              Okay.  You -- excuse me -- PASE has

12:00:55  7    listed this amount of the claim as disputed.  Do you

12:00:58  8    see that?

12:00:58  9        A.    I do.

12:00:59 10        Q.    Why is it disputed?  What's the dispute?

12:01:09 11              MR. PATTERSON:  I'm going to object to

12:01:10 12    the extent it calls for a legal conclusion.

12:01:18 13        A.    Well, we were -- we were shut down by Oxbow in

12:01:23 14    June of 2018.

12:01:24 15        Q.    (By Mr. Jacobs)  Did PASE make its sublease

12:01:28 16    payments in 2019?

12:01:33 17              MR. PATTERSON:  Objection; asked and

12:01:36 18    answered.

12:01:41 19        A.    I mean, the matter of the lease payments is in

12:01:47 20    dispute, it's in legal filings.  And, you know, I have

12:01:53 21    to -- I would have to refer to the attorneys on -- on

12:02:02 22    how that -- how that dispute is -- I don't know --

12:02:08 23    positioned or styled or whatever it is.  I'm not -- I'm

12:02:13 24    not an attorney, but I know it's in dispute.

12:02:17 25        Q.    (By Mr. Jacobs)  Okay.  Let's go to page 24 of

Ted Boriack - June 16, 2021                    23

12:02:26 1  37.  You'll see here in 2.1 on page 24 of Exhibit 3

12:02:47 2  there's another reference to the sublease.  Do you see

12:02:51 3  that?

12:02:52 4       A.   Okay.  I'm want to make sure I'm on the

12:02:54 5  right -- 24 of 37?

12:02:57 6       Q.   Yes, sir.

12:02:58 7       A.   The 24 of 37?

12:02:58 8       Q.   Yes, sir.

12:02:59 9       A.   At the top here?

12:03:00 10      Q.   Yes, sir.

12:03:00 11      A.   Yeah, I see this.

12:03:01 12      Q.   Okay.  And then there's a reference to a

12:03:03 13 transformer lease.  Do you see that?

12:03:06 14      A.   I do.

12:03:06 15      Q.   And then there's a statement of contract to be

12:03:08 16 assumed, right?

12:03:14 17      A.   Okay.

12:03:14 18      Q.   Which contract is being referenced here to be

12:03:20 19 assumed?

12:03:20 20      A.   I would expect that it would be the

12:03:50 21 transformer lease that's in the line just above it.

12:03:55 22      Q.   And not the sublease agreement, correct?

12:04:00 23      A.   Well, I don't see the sublease for the land on

12:04:20 24 here, I don't believe.  But I'm not -- I'm not quite

12:04:25 25 sure if I fully understand all of the particulars on

12:04:31  1   there.  It sounds like a legal matter.

12:04:34  2         Q.   If I could ask you another question about

12:04:38  3   taxes.  You've listed the IRS and the Jefferson County

12:04:43  4   Appraisal District as two entities that PASE would owe

12:04:46  5   taxes on.  Those are potential creditors, right?

12:04:49  6         A.   Okay.

12:04:50  7         Q.   Are there any other taxing authorities that

12:04:54  8   PASE pays taxes to?

12:04:56  9         A.   In the past we have paid taxes to the City of

12:05:07 10   Port Arthur.  But then Oxbow -- there was some, oh, I

12:05:22 11   guess, rearrangement of the taxing -- the taxing

12:05:26 12   arrangement with the City, and Oxbow stepped in and --

12:05:32 13   and some way or another -- I'm not sure how it all

12:05:36 14   happened.  But they somewhat stepped in the shoes of

12:05:42 15   PASE and were working with the City directly on our

12:05:49 16   taxes.  And so I don't -- I have not -- we have not had

12:05:52 17   contact with the City of Port Arthur on taxes in a

12:05:55 18   while.

12:06:16 19              (Exhibit No. 4 marked.)

12:06:16 20         Q.   (By Mr. Jacobs)  I'm going to hand you Exhibit

12:06:18 21   No. 4, sir.

12:06:22 22         A.   So we're through with this one?

12:06:25 23         Q.   You can put it aside, sir.  I don't think I'll

12:06:28 24   have to come back to it but you never know.

12:06:31 25         A.   Okay.

Ted Boriack - June 16, 2021                    25

12:06:31  1        Q.    All right.   This falls within -- just so we're
12:06:39  2    all clear -- Topic No. 4 which is the statement of
12:06:44  3    financial affairs for PASE.   Okay?
12:06:47  4        A.    Okay.
12:06:55  5        Q.    The first page on here is the balance sheet.
12:06:57  6    The first two pages is PASE's balance sheet.   Do you
12:07:06  7    see that?
12:07:06  8        A.    I see it.
12:07:06  9        Q.    Who prepared this balance sheet, sir?
12:07:09 10        A.    That was prepared by Wes McMahan, his
12:07:18 11    accounting firm.
12:07:22 12        Q.    Who on behalf of PASE is responsible for
12:07:24 13    interacting with PASE's accountants?
12:07:27 14        A.    Integral Power.
12:07:27 15        Q.    Okay.   Who at Integral Power?   Is that your
12:07:29 16    responsibility or is that Mr. Deyoe's?
12:07:33 17        A.    I generally handle it.
12:07:48 18        Q.    So just looking through here, the first thing
12:07:51 19    that's listed are the bank accounts.   Those are the
12:07:54 20    assets, right?
12:07:55 21        A.    I see it.
12:07:57 22        Q.    Okay.   And then there is the manager's
12:07:59 23    account.   Do you see that?
12:08:00 24        A.    I see it.
12:08:01 25        Q.    Is that the only account that, as of April 14,

CONTINENTAL COURT REPORTERS, INC.
(713) 522-5080

12:08:06  1   2021, was left in operation for PASE?

12:08:09  2        A.   That's the only one.

12:08:13  3        Q.   Then there's accounts receivable below that.

12:08:17  4   Do you see it?

12:08:18  5        A.   I see it.

12:08:18  6        Q.   The AR for electricity, that's the -- that's

12:08:20  7   the electric bills to Oxbow that you've referenced

12:08:24  8   earlier, right?

12:08:25  9        A.   That's right.

12:08:25 10        Q.   And the $163,332.19 figure, does that reflect

12:08:32 11   the offsets for not making the sublease payments that

12:08:35 12   you referenced earlier?

12:08:42 13        A.   Those are just the invoiced amounts to Oxbow.

12:08:44 14        Q.   So it does not reflect any credits for not

12:08:48 15   making the sublease payments?

12:08:50 16        A.   Those are strictly the invoiced amounts to

12:08:54 17   Oxbow.

12:08:55 18        Q.   If we were to subtract the sublease payments

12:08:59 19   that have not been made to date, what would that figure

12:09:02 20   be instead of $163,332.19?

12:09:06 21        A.   I don't know what that amount would be but

12:09:17 22   those lease payments are in dispute; so, I don't know

12:09:21 23   about the appropriateness of the question.

12:09:24 24        Q.   Okay.  Let's go down to "Fixed Assets."

12:09:34 25        A.   Okay.

12:09:34  1        Q.    There's a listing here for plant structures

12:09:38  2    and improvements.   Do you see that?

12:09:40  3        A.    I do.

12:09:41  4        Q.    How were these values calculated?

12:09:43  5        A.    Well, as investment was made in the plant,

12:09:52  6    those entries were then put into these different fixed

12:09:56  7    asset accounts and then just -- and totaled.

12:10:02  8        Q.    So is that the, sort of, original cost for

12:10:06  9    each of these items?

12:10:07 10        A.    That's correct.

12:10:09 11        Q.    Is the same thing true for the office fixed

12:10:24 12    assets that are listed in the 10,400 line items?

12:10:30 13        A.    Right.

12:10:34 14        Q.    Let's go to the next page.   There's an

12:10:37 15    accounts payable of $42,460.94.   Do you see that?

12:10:43 16        A.    I do.

12:10:43 17        Q.    What is included within that, sir?

12:10:45 18        A.    I would have to refer to the ledger.

12:10:48 19        Q.    Do you mean the general ledger?

12:10:49 20        A.    Yes.

12:10:50 21        Q.    Okay.   What about the accrued expense

12:10:54 22    liability of $51,384.50?

12:10:59 23        A.    Yeah, I would just refer to the ledger.   The

12:11:02 24    general ledger is what feeds into all of these

12:11:03 25    categories.

Ted Boriack - June 16, 2021                                28

12:11:04  1        Q.   Okay.  And then the asset retirement
12:11:06  2    obligation of 740,715, where did that come from?
12:11:13  3        A.   That's a number that's -- that was an estimate
12:11:28  4    that we had prepared some time ago, and it was just a
12:11:36  5    number that was then included in as a line item by
12:11:40  6    the -- by the accountants.
12:11:42  7        Q.   By "we" preparing them, who?
12:11:47  8        A.   Yeah, it was -- it was an Integral Power
12:11:49  9    prepared number.  But based upon just what -- what the
12:11:53 10    estimated amount, the cost of removal of the plant
12:11:59 11    would be.  That's not salvage value.  That's just
12:12:11 12    removal.
12:12:12 13        Q.   Okay.  Let's go to the next page.  This is the
12:12:15 14    Profit and Loss for PASE for the year of 2020.  Do you
12:12:21 15    agree?
12:12:21 16        A.   I see it, yes.
12:12:22 17        Q.   Top line was income of GLC power sales at
12:12:28 18    $216,728.01.  Do you see that?
12:12:29 19        A.   I see it.
12:12:31 20        Q.   And the last power sale to Great Lakes Carbon
12:12:34 21    would have been in, what, the first quarter of 2020?
12:12:37 22        A.   I'm sorry.  Repeat the question.
12:12:41 23        Q.   Sure.  When was the last power -- sale of
12:12:44 24    power to Oxbow?
12:12:47 25        A.   April 2020, I believe.

CONTINENTAL COURT REPORTERS, INC.
(713) 522-5080

Ted Boriack - June 16, 2021                    29

12:12:58  1        Q.   If I can go down to the bottom, there's a line

12:13:02  2   item of 50380 for electricity at $209,161.14.  Do you

12:13:09  3   see that?

12:13:15  4        A.   You're on page 1 of 3?  Where are you?

12:13:17  5        Q.   3 of 5, sir.  The same page.

12:13:20  6        A.   3 of 5?  I've got 1 of 3 here.

12:13:22  7        Q.   I'm at the top.  I'm sorry.

12:13:24  8             MR. PATTERSON:  The top numbers.  3 of 5,

12:13:27  9   the top right.  All the way to the top.  Top, top, top.

12:13:32 10        Q.   (By Mr. Jacobs)  You've got to move your

12:13:33 11   finger higher.  Top of the page.

12:13:38 12        A.   Oh, okay.  Fine.  Sorry about that.

12:13:40 13        Q.   No worries.

12:13:41 14             You'll see there's a $209,161.14 figure

12:13:46 15   at the bottom, right?

12:13:47 16        A.   I see it.

12:13:47 17        Q.   Does that reflect the cost of electricity that

12:13:52 18   PASE gets from Entergy that is then sold to Great Lakes

12:13:58 19   Carbon or Oxbow?

12:14:00 20        A.   I believe that would be right.

12:14:02 21        Q.   Go to the next page, sir.  There's a reference

12:14:29 22   here to predictive maintenance.  Do you see that?

12:14:34 23        A.   I see it.

12:14:35 24        Q.   At a little over $12,000?

12:14:38 25        A.   Yes.

Ted Boriack - June 16, 2021                    30

12:14:39  1        Q.    What is encompassed within this, sir?

12:14:41  2        A.    That's our -- we have a gentleman that helps

12:14:49  3    us out at the plant, who makes regular visits to the

12:14:56  4    plant and keeps an eye on the plant and does light

12:15:00  5    maintenance.

12:15:01  6        Q.    That's Mr. Dickman?

12:15:02  7        A.    Yeah, Nathan Dickman.  And he's -- I believe

12:15:05  8    he's what's charged to that account.

12:15:06  9        Q.    Okay.  And then the testing services, what

12:15:08 10    would that be, sir?

12:15:09 11        A.    To be sure, I'd have to look at the ledger.

12:15:20 12        Q.    Okay.  And then other professional services

12:15:22 13    for a little over 26,000 for the plant, what would that

12:15:26 14    be?

12:15:27 15        A.    Well, again, I would want to refer to the

12:15:46 16    general ledger because all of these categories are

12:15:51 17    built up off the general ledger.

12:15:53 18        Q.    Okay.

12:15:56 19        A.    But let me see, that is...  Yeah, I would have

12:16:18 20    to refer to the ledger to make sure that I got the

12:16:23 21    right expense in the right category.

12:16:27 22        Q.    Okay.  Moving down, there's a reference to the

12:16:29 23    GLC sublease payment of just under $64,000.  Do you see

12:16:34 24    that?

12:16:34 25        A.    I see it.

Ted Boriack - June 16, 2021                        31

12:16:35  1        Q.    Is that an accounting entry or is that an
12:16:38  2   actual payment that was made for the sublease?
12:16:51  3        A.    I think that would be the January payment,
12:17:06  4   January of 2020, that was offset against the power
12:17:12  5   bill.
12:17:13  6        Q.    So was it actually -- I mean, I just want to
12:17:17  7   make sure I understand.
12:17:19  8              Was just under $64,000 actually paid by
12:17:23  9   PASE to Oxbow for the January 2020 payment in terms of
12:17:27  10  cash going out the door or was it -- is it just an
12:17:32  11  accounting entry?
12:17:32  12       A.    I don't know exactly what you mean by "just an
12:17:35  13  accounting entry."  It was a credit.  A power bill was
12:17:40  14  issued to Oxbow for January power delivery, which is
12:17:46  15  real out-of-pocket money.  It costs money to deliver
12:17:50  16  power.
12:17:51  17             Oxbow received the power during the month
12:17:53  18  of January, and then -- and then raised an issue with a
12:18:05  19  lease payment or this sublease payment; and so there
12:18:08  20  was a credit worked out against the January power bill
12:18:15  21  that Oxbow, you know, was being asked to pay for
12:18:19  22  delivery of power against that invoiced amount for the
12:18:25  23  sublease.  So --
12:18:25  24       Q.    And that -- I'm sorry.  I didn't mean to --
12:18:26  25       A.    Yeah.  So effectively, there was real transfer

Ted Boriack - June 16, 2021                          32

12:18:29  1    of dollars.

12:18:33  2         Q.   The invoice on the sublease, what time period

12:18:37  3    did it cover?

12:18:38  4         A.   I'd have to look at it.

12:18:40  5         Q.   Okay.  We next see Integral Power expenses for

12:18:49  6    travel and office expenses.  Do you see those?

12:18:52  7         A.   I see them.

12:18:52  8         Q.   I take it you get reimbursed by PASE for your

12:19:01  9    home office expenses?

12:19:02 10         A.   Yes.  We have a -- we have an office expense

12:19:14 11    that we -- that we recover for having -- having the

12:19:18 12    offices necessary to do the PASE -- the PASE

12:19:22 13    activities.

12:19:22 14         Q.   What is encompassed within the office expense

12:19:25 15    that you get reimbursed?

12:19:28 16         A.   You have to have an actual office space.  You

12:19:32 17    know, you have to have a -- you have to have a building

12:19:36 18    and a roof and electricity and, you know, Internet

12:19:42 19    connections and phones and all of those types of things

12:19:47 20    that go with having an office.

12:19:49 21         Q.   And is that building for you, your home

12:19:55 22    residence?

12:19:55 23         A.   Yeah, we work out of home offices.

12:19:58 24         Q.   There's a reference to the Integral Power fee,

12:20:08 25    $450,000 for the year of 2020, right?

Ted Boriack - June 16, 2021                    33

12:20:11  1        A.   Yes.
12:20:11  2        Q.   If we go down, there's a reference to
12:20:22  3    nonproperty insurance of approximately 80- -- just
12:20:26  4    under $85,000.  What would that be, sir?
12:20:30  5        A.   I would have to defer to Mr. Deyoe on that one
12:20:38  6    because he handles the insurance.  So there were -- it
12:20:45  7    was an invoice or invoices that were -- and also it
12:20:47  8    would be in the ledger, the general ledger, which is
12:20:51  9    used to build up all of this.
12:20:53 10        Q.   Are your and Mr. Deyoe's medical, dental and
12:20:57 11    other insurances paid by PASE?
12:21:00 12        A.   We have medical -- medical insurance.
12:21:04 13        Q.   And it's paid by PASE?
12:21:06 14        A.   It's paid by PASE.
12:21:10 15        Q.   So that would be included in this?
12:21:14 16        A.   Included in what?
12:21:15 17        Q.   In that almost $85,000 figure.
12:21:21 18        A.   I would have to defer to the ledger.  I would
12:21:32 19    have to look at the ledger to make sure I don't
12:21:35 20    misspeak on it.
12:21:35 21        Q.   All right.  And then we have Oxbow legal at
12:21:38 22    82- -- the item 82,000 there, right?  What do we mean
12:21:42 23    by "Oxbow legal" here as this line item?
12:21:46 24        A.   Just the costs associated with the legal
12:21:50 25    matters and dealing with Oxbow.

Ted Boriack - June 16, 2021                          34

12:21:52 1        Q.    So if things are marked as Oxbow -- so

12:22:00 2     expenses are marked as "Oxbow legal" or "Oxbow matter,"

12:22:04 3     it is referencing the litigation that's been ongoing

12:22:07 4     between PASE and Oxbow now for four years?

12:22:13 5        A.    Yeah, but -- yes.

12:22:21 6        Q.    And so in 2020, that was just over $966,000,

12:22:25 7     right?

12:22:25 8        A.    Yes.

12:22:27 9        Q.    And PASE had a net operating -- we'll keep

12:22:33 10    going.

12:22:33 11              PASE had net income, if we look at the

12:22:36 12    next page, of negative $228,866,229 for the year 2020,

12:22:46 13    right?

12:22:46 14       A.    Yes.

12:22:49 15       Q.    Have you done projections or forecasts for

12:22:54 16    what PASE's net income is going to be for 2021?

12:23:03 17       A.    No.

12:23:04 18       Q.    Or beyond.

12:23:07 19       A.    No.

12:23:07 20       Q.    Is it your expectation it will be similar to

12:23:10 21    what we see here of negative $2 million each year?

12:23:15 22       A.    No, I have not done a projection.

12:23:18 23       Q.    Do you think it will be approximately negative

12:23:21 24    $2 million annually going forward?

12:23:23 25       A.    I would have --

```
12:23:23  1              MR. PATTERSON:  Objection; calls for
12:23:25  2   speculation.
12:23:27  3        Q.   (By Mr. Jacobs)  What?
12:23:27  4        A.   I have not done such a projection.
12:23:31  5        Q.   Has anybody, to your knowledge?
12:23:33  6        A.   I don't know.
12:23:35  7        Q.   You don't know whether anyone has or you don't
12:23:39  8   know --
12:23:40  9        A.   I don't know if anyone else has.
12:23:42 10        Q.   Have you asked anyone to do so?
12:23:44 11        A.   No.
12:23:46 12              (Exhibit No. 8 marked.)
12:23:46 13        Q.   (By Mr. Jacobs)  I'm handing you the next
12:24:08 14   exhibit, which is Exhibit No. 8, sir.  Let me know when
12:24:47 15   you're ready, Mr. Boriack.
12:26:12 16        A.   Okay.
12:26:12 17        Q.   Exhibit No. 8 is the Monthly Operating Report
12:26:18 18   For Small Business Under Chapter 11 for PASE.  Do you
12:26:22 19   see that, sir?
12:26:23 20        A.   I do.
12:26:23 21        Q.   And, in fact, you signed it, correct?
12:26:25 22        A.   I did.
12:26:25 23        Q.   As the responsible party, right?
12:26:28 24        A.   Well, Integral Power is the responsible party.
12:26:33 25        Q.   Okay.  I'm going to ask a few questions.
```

Ted Boriack - June 16, 2021                    36

12:26:41  1              On the questionnaire, on Question No. 1,
12:26:43  2      it asks:  Did the business operate during the entire
12:26:46  3      reporting period?  And that reporting period is
12:26:51  4      April 4 -- excuse me -- April 14th through April 30th
12:26:55  5      of 2021.  Do you see that, sir?
12:26:57  6          A.   Yes.
12:26:57  7          Q.   And the answer was "yes."  Right?
12:26:59  8          A.   Yes.
12:26:59  9          Q.   What operations did PASE undertake in between
12:27:05 10      April 14th and April 30th?
12:27:08 11          A.   Well, we were busy with the matters of -- of
12:27:18 12      this Chapter 11 process, and we were working -- for
12:27:23 13      example, Bank of America.  You know, it takes time to
12:27:26 14      deal -- to deal with such things because the account
12:27:30 15      went into a debtor in possession account.  There's
12:27:35 16      various things that have to be done just, you know,
12:27:42 17      day-to-day bookkeeping that has to be done.  We have to
12:27:46 18      continue to keep an eye on the asset.  And so
12:27:53 19      whether -- whether either Ray and I go out to the plant
12:27:56 20      or Nathan goes out to the plant and maintaining just an
12:28:01 21      ongoing, you know, monitoring of the asset.
12:28:08 22              Then there's the filings that have to be
12:28:10 23      done for the plant.
12:28:15 24          Q.   What filings?
12:28:16 25          A.   Just, like, you know, state -- we just hit one

12:28:20  1    yesterday, June 15th, right?  You've got to do the --
12:28:24  2    either you have to file an extension or you have to
12:28:25  3    file a -- like a periodic report with the Secretary of
12:28:28  4    State's office or a -- you know, the information
12:28:30  5    reports that go with the state franchise fee filings
12:28:33  6    and that type of thing.
12:28:34  7        Q.   Is the plan to sell the assets that are in the
12:28:37  8    storage units, the two storage units, and onsite in
12:28:42  9    Port Arthur?
12:28:43 10        A.   What?
12:28:43 11        Q.   Is the plan to sell the assets, meaning the
12:28:47 12    storage units and onsite in Port Arthur?
12:28:50 13        A.   Yes.
12:28:51 14        Q.   When?
12:28:51 15        A.   Well, we have begun.  There has been a partial
12:28:58 16    asset sale.  That's also one of the things that takes
12:29:02 17    time.  But there's been a partial sale of some
12:29:04 18    equipment.  And we have -- you know, it's the process
12:29:11 19    of taking -- you know, getting the equipment and
12:29:16 20    finding the buyers.
12:29:17 21        Q.   When did PASE begin the process to start
12:29:21 22    selling those assets?
12:29:22 23        A.   I would say, you know, a couple of months ago.
12:29:30 24    The first transaction began -- that was -- the first
12:29:35 25    transaction was April 1st, so it would go prior to

Ted Boriack - June 16, 2021                          38

12:29:38  1    that.  You know, exactly which day, I don't -- I don't

12:29:42  2    know.

12:29:42  3         Q.   Could it have been in 2021?

12:29:44  4         A.   I'm not -- I'm not sure right on, you know,

12:29:54  5    exactly when it occurred.  But I mean, it's -- it has

12:29:56  6    begun and we have completed, you know, an asset sale

12:29:59  7    that closed.  That was April 1 when that funded, and

12:30:04  8    that's shown in the operating report.

12:30:06  9         Q.   Were there any efforts made to sell any of

12:30:08 10    those assets in 2020?

12:30:09 11         A.   I know that, of course, we've been looking at

12:30:23 12    it.  And so I would say that the asset sale process and

12:30:33 13    just, you know, the effort that goes into doing that

12:30:36 14    had begun in 2020, you know.  But we hadn't -- we

12:30:40 15    hadn't closed a sale until 2021.

12:30:42 16         Q.   When?  When did that start in 2020?

12:30:45 17         A.   Like I said, I don't know exactly what day.

12:30:48 18         Q.   Did you talk to any potential buyers of those

12:30:51 19    assets in 2020?

12:30:51 20         A.   I think most of our focus was on -- on getting

12:31:02 21    our arms around, you know, what to sell or -- and just,

12:31:08 22    you know, trying to, you know, put together the

12:31:11 23    valuation and that type of thing.

12:31:13 24         Q.   Can you identify any potential buyers you had

12:31:19 25    discussions with in 2020?

Ted Boriack - June 16, 2021                    39

12:31:21  1        A.    From 2020?  No.

12:31:25  2        Q.    Did you list anything for sale in 2020?

12:31:29  3        A.    I don't believe so.

12:31:43  4        Q.    The next question on the questions you were

12:31:46  5   asked:  Do you plan to continue to operate the business

12:31:50  6   next month?  And the answer is "yes."  Do you see that?

12:31:55  7        A.    Yes.

12:31:55  8        Q.    Okay.  And what activities are planned for the

12:31:57  9   next month, according to your answer of "yes"?

12:32:02 10        A.    Oh, I think it's about the asset sale.  And --

12:32:05 11        Q.    Anything -- sorry.  I didn't mean to cut you

12:32:06 12   off.

12:32:06 13        A.    Yeah, it's pretty much -- that's a -- that

12:32:11 14   would be the -- you know, we have other things to do,

12:32:16 15   too.  We've got to finish the tax return.  We've got

12:32:19 16   more accounting to do that's ongoing.  So, all of

12:32:24 17   those -- all of those activities.

12:32:26 18        Q.    Anything else, sir?

12:32:28 19        A.    Well, you know, as required, we support the

12:32:38 20   legal effort with, you know, whatever may arise.

12:32:43 21        Q.    What do you mean by "the legal effort"?

12:32:46 22        A.    Kind of referring to this statement that we

12:32:51 23   just looked at where you've got the Oxbow legal.

12:32:55 24        Q.    Okay.

12:32:55 25        A.    The things that are associated with that.

Ted Boriack - June 16, 2021                    40

```
12:33:04  1        Q.   Question No. 5 asks:  Have you deposited all
12:33:07  2   of the receipts for your business into DIP accounts?
12:33:12  3   Do you see that?  And you answered "N/A."
12:33:15  4        A.   There were no deposits in April.  Or this --
12:33:18  5   actually, I'm sorry.  The April 14th to 30, that's the
12:33:27  6   period of time.
12:33:27  7        Q.   Right.
12:33:27  8        A.   Yeah, April 14th to 30 there were no deposits.
12:33:36  9        Q.   If you'll go to page 3 of 19.  I'm working on
12:33:39 10   the top of the page again, sir.  Are you with me?
12:33:57 11   We're on page 3 of 19 of Exhibit 8.
12:34:01 12        A.   Right.
12:34:01 13        Q.   Okay.  Section 7 talks about projections.  Do
12:34:04 14   you see that?
12:34:04 15        A.   Okay.
12:34:08 16        Q.   And this section is left blank.  Do you see
12:34:14 17   that?
12:34:14 18        A.   Yes.
12:34:15 19        Q.   And that's because there have been no
12:34:17 20   projections, right?
12:34:18 21        A.   Well, this was the first...  This was the
12:34:36 22   first report, so...  This is my first report effort, so
12:34:55 23   I don't...
12:34:55 24        Q.   Are you working on projections for the next
12:35:00 25   report?
```

Ted Boriack - June 16, 2021                                    41

12:35:01  1      A.   I would have to, you know, defer to counsel on

12:35:11  2   really what -- what would be necessary to do here.  I'm

12:35:15  3   -- this is -- this is the first report we've issued, so

12:35:19  4   we're...  I would have to look further into this.

12:35:27  5      Q.   Okay.  There's a question there -- I'll just

12:35:30  6   ask you about 35.  Total projected cash receipts for

12:35:33  7   the next month, and there was no answer to that.  Do

12:35:37  8   you see that?

12:35:37  9      A.   I see that.

12:35:38 10      Q.   That would be zero.  True?

12:35:48 11           MR. PATTERSON:  Object; it calls for

12:35:54 12   speculation.

12:35:54 13      Q.   (By Mr. Jacobs)  Let me rephrase the question.

12:35:56 14           Since this report was provided on May 25,

12:36:00 15   2021, have there been any cash receipts for PASE?

12:36:03 16      A.   I don't believe so.

12:36:14 17      Q.   Have there been cash disbursements by PASE?

12:36:27 18           MR. PATTERSON:  Object to the form of the

12:36:28 19   question as to -- when are you talking about?

12:36:34 20           MR. JACOBS:  Sure.

12:36:34 21      Q.   (By Mr. Jacobs)  Have there been cash

12:36:37 22   disbursements by PASE since May 25, 2021?

12:36:41 23      A.   Since May 25th?

12:36:48 24           MR. PATTERSON:  Two weeks.

12:36:50 25           MR. JACOBS:  Three weeks.

12:36:55  1          A.    We made payments to Nathan.  I know there were

12:36:59  2   a couple of checks that we cut to Nathan Dickman.  Are

12:37:04  3   you just talking about expenditures?

12:37:08  4          Q.    (By Mr. Jacobs)  Expenditures.  Cash --

12:37:10  5                 MR. PATTERSON:  No.  Object to the form

12:37:12  6   of the question and the colloquy.

12:37:13  7                 He hasn't asked you a question.  If you

12:37:16  8   don't understand it, ask him.  But that's not what he

12:37:19  9   said.  So it was cash, is what he said.  He didn't say

12:37:27 10   anything about checks, accrual, whatever.

12:37:29 11                 If you're going to talk accounting, you

12:37:31 12   need to be specific.

12:37:36 13          Q.    (By Mr. Jacobs)  Have there been payments made

12:37:38 14   by PASE, since May 25, 2021, to anyone or anything?

12:37:46 15          A.    Yes.  There's --

12:37:48 16                 MR. PATTERSON:  Objection; nonresponsive

12:37:51 17   after that.

12:37:52 18                 He just asked you "yes" or "no."

12:37:53 19          Q.    (By Mr. Jacobs)  To who or what?

12:37:58 20          A.    Nathan Dickman.

12:38:03 21          Q.    How much to Mr. Dickman?

12:38:13 22          A.    I would defer -- I would just refer to the

12:38:17 23   ledger on that, you know, to make sure I get the

12:38:20 24   amounts right.

12:38:21 25          Q.    Who else, other than Mr. Dickman?

Ted Boriack - June 16, 2021                                    43

12:38:23  1        A.    And then the medical insurance.

12:38:25  2        Q.    For you and Mr. Dickman and Mr. Deyoe?

12:38:29  3        A.    Well, for me and -- for me and Mr. Deyoe.

12:38:33  4        Q.    But not for Mr. Dickman?

12:38:35  5        A.    No.

12:38:39  6        Q.    Okay.  So we've got Mr. Dickman, we've got

12:38:43  7   Blue Cross Blue Shield.  What other payments have been

12:38:46  8   made by PASE since May 25, 2021?

12:38:49  9        A.    Well, to see if there would be anything else,

12:38:57 10   I would just defer to the bank statement.

12:38:59 11        Q.    Has Integral Power been paid?

12:39:03 12              MR. PATTERSON:  Objection; form of the

12:39:04 13   question.  It's argumentative.  We're assuming here a

12:39:12 14   very specific time period, so...

12:39:14 15        Q.    (By Mr. Jacobs)  Has Integral Power been paid

12:39:17 16   by PASE since May 25, 2021?

12:39:21 17        A.    No.

12:39:27 18        Q.    Have you been paid since -- by PASE since

12:39:33 19   May 25, 2021, for your home office expenses?

12:39:35 20        A.    No.

12:39:36 21        Q.    What about Mr. Deyoe?

12:39:43 22              MR. PATTERSON:  Objection again to the

12:39:44 23   form.  You're bouncing around time periods.  Some are

12:39:51 24   specific, some are generic.  Is it still May 25th?

12:39:55 25              MR. JACOBS:  Yes.

12:39:55  1              MR. PATTERSON:   Okay.   Please put it in

12:39:57  2  your question.

12:40:01  3       A.   No, I don't believe so.

12:40:03  4       Q.   (By Mr. Jacobs)  Was Integral Power paid

12:40:10  5  anything by PASE in the month of May 2021?

12:40:15  6       A.   No.

12:40:25  7       Q.   The same question for the month of June 2021.

12:40:34  8       A.   No.

12:40:34  9       Q.   Have professionals that have been hired by

12:40:43 10  PASE been paid by PASE since May 25, 2021?

12:40:48 11       A.   I believe so.

12:40:49 12       Q.   Who?

12:40:50 13       A.   I believe our accountant has been paid, but I

12:40:52 14  would have to verify because he's -- he's -- I think we

12:40:58 15  have him on auto pay.

12:41:01 16       Q.   When you say accountant, are you referring to

12:41:05 17  BDO or are you referring to McMahan?

12:41:08 18       A.   Our regular month-to-month accountant, that's

12:41:12 19  Wes McMahan.

12:41:14 20       Q.   Okay.  Any other professionals?

12:41:23 21       A.   No.

12:41:31 22       Q.   Let's go to the next page, sir.  The boxes for

12:41:40 23  additional documents for budget, projection and

12:41:42 24  forecast reports, those were not checked; correct, sir?

12:41:46 25       A.   That's correct.

Ted Boriack - June 16, 2021                          45

12:41:49  1        Q.    Because there are none, right?

12:41:51  2        A.    That's right.

12:41:52  3        Q.    Why not?

12:42:01  4               MR. PATTERSON:  Object as argumentative.

12:42:08  5    I mean, you're suggesting that they should be.  They're

12:42:10  6    not.  They weren't provided and they weren't checked.

12:42:14  7    So either argue with him about it or ask him a direct

12:42:21  8    question, but...

12:42:22  9        Q.    (By Mr. Jacobs)  Did you understand my

12:42:24 10    question?

12:42:24 11               MR. PATTERSON:  Is this your assistant

12:42:26 12    that keeps whispering in your ear and passing you

12:42:30 13    notes?  I mean, is he going to ask questions as well?

12:42:32 14        Q.    (By Mr. Jacobs)  Do you understand my

12:42:33 15    question?

12:42:34 16        A.    Well, it just says "if available, attach

12:42:47 17    copies."  And so --

12:42:49 18        Q.    I guess, let me ask --

12:42:51 19        A.    -- that's what we did.

12:42:53 20        Q.    Okay.  Let me try a different question.

12:42:55 21               Is there a reason why budget, projection

12:43:01 22    or forecast reports have not been prepared?

12:43:10 23               MR. PATTERSON:  Is that -- I'm going to

12:43:13 24    object.

12:43:14 25        A.    I don't understand the question.

Ted Boriack - June 16, 2021                    46

| | | |
|---|---|---|
| 12:43:14 | 1 | MR. PATTERSON:  Is that just a serious |
| 12:43:17 | 2 | question?  Really?  I mean, we're acting like we don't |
| 12:43:20 | 3 | all know that the company is now liquidating and they |
| 12:43:24 | 4 | are going to disperse the proceeds.  I mean, is that |
| 12:43:25 | 5 | some big surprise to you?  I mean, you keep trying to |
| 12:43:29 | 6 | beat up on the witness because there's no projections |
| 12:43:31 | 7 | or budgets, but they're not operating.  We all |
| 12:43:34 | 8 | acknowledge that they are not operating.  I hope that's |
| 12:43:38 | 9 | not a huge surprise to you, but it's in all of the |
| 12:43:42 | 10 | schedules and the plan and we've talked about it in |
| 12:43:45 | 11 | court.  And is this -- is this a revelation to anyone |
| 12:43:49 | 12 | here?  So, no, there are no budgets or projections. |
| 12:43:56 | 13 | It's a liquidating case.  There is no argument as to |
| 12:44:03 | 14 | that.  We're liquidating. |
| 12:44:05 | 15 | If you tell us what kind of budget you |
| 12:44:06 | 16 | think it ought to be, well, maybe we'll work on it. |
| 12:44:15 | 17 | We'll talk about it.  But to keep suggesting to the |
| 12:44:18 | 18 | witness that there should be some projection or budget |
| 12:44:20 | 19 | is -- it's just wasting our time.  It just goes back to |
| 12:44:23 | 20 | my earlier comment.  This is -- I know what you're |
| 12:44:26 | 21 | doing and it's fine but let's just not totally waste |
| 12:44:30 | 22 | our time.  All right?  The seven hours is yours.  But |
| 12:44:33 | 23 | this is silly. |
| 12:44:33 | 24 | MR. JACOBS:  If you think your time is |
| 12:44:34 | 25 | being wasted, you are welcome to leave. |

Ted Boriack - June 16, 2021                    47

| | | |
|---|---|---|
| 12:44:38 | 1 | MR. PATTERSON:  I am.  It is wasted. |
| 12:44:38 | 2 | MR. JACOBS:  You are welcome to leave. |
| 12:44:41 | 3 | MR. PATTERSON:  It is wasted. |
| 12:44:42 | 4 | Is this guy going to continually just |
| 12:44:45 | 5 | whisper in your ear and pass you notes?  Who is this? |
| 12:44:47 | 6 | If he's going to tell you -- just talk on the record. |
| 12:44:48 | 7 | You don't need to whisper. |
| 12:44:49 | 8 | MR. GOLDBERG:  My name is Michael |
| 12:44:51 | 9 | Goldberg. |
| 12:44:51 | 10 | MR. PATTERSON:  Okay. |
| 12:44:52 | 11 | MR. GOLDBERG:  I am co-counsel.  I have a |
| 12:44:53 | 12 | right to talk to my lawyer. |
| 12:44:53 | 13 | MR. PATTERSON:  Excellent.  Talk on the |
| 12:44:55 | 14 | record. |
| 12:44:55 | 15 | MR. GOLDBERG:  And I'm telling him to |
| 12:44:57 | 16 | simply ignore you because you are taking our time, so |
| 12:44:59 | 17 | we're going to continue to ask questions -- |
| 12:44:59 | 18 | MR. PATTERSON:  Knock yourself out. |
| 12:45:01 | 19 | MR. GOLDBERG:  -- and we'll let the |
| 12:45:01 | 20 | judge see how you're just interrupting -- |
| 12:45:01 | 21 | MR. PATTERSON:  Excellent. |
| 12:45:06 | 22 | MR. GOLDBERG:  -- and not letting us go |
| 12:45:07 | 23 | forward. |
| 12:45:07 | 24 | MR. PATTERSON:  I have not interrupted |
| 12:45:09 | 25 | anyone.  He was done questioning.  You're interrupting |

Ted Boriack - June 16, 2021                                48

12:45:12  1   by continuing to whisper in people's ears while we're

12:45:16  2   conducting a deposition.  So we can keep going but...

12:45:19  3                   MR. JACOBS:  May I keep going?

12:45:20  4                   MR. PATTERSON:  Of course.

12:45:22  5                   MR. JACOBS:  Excellent.  Let's go.

12:45:24  6                   MR. PATTERSON:  I'm trying to tell you.

12:45:25  7   You were trying to make a big deal out of these

12:45:28  8   projections.  And if there's something you think you

12:45:30  9   need, go ahead and tell me.  We'll talk about it.  But

12:45:33 10   this -- this act with this witness to try to intimidate

12:45:36 11   them, that there's something wrong, is just ridiculous.

12:45:41 12                   So, yeah, go on.  Just keep talking about

12:45:44 13   forecasts and budgets in this liquidating case.

12:45:48 14      Q.   (By Mr. Jacobs) Mr. Boriack, am I intimidating

12:45:51 15   you?

12:45:52 16      A.   (No response).

12:45:52 17                   MR. PATTERSON:  You're not but you're

12:45:53 18   certainly trying.

12:45:55 19      Q.   (By Mr. Jacobs)  Am I?

12:45:56 20                   MR. PATTERSON:  Ask a question.  That's

12:45:57 21   argumentative and it's not relevant.  So trying to

12:46:01 22   stare him down, asking if you're intimidating is

12:46:05 23   inappropriate for a deposition.  Ask your question.

12:46:08 24   Move on.  And Mr. Goldberg can continue to whisper in

12:46:14 25   your ear.

Ted Boriack - June 16, 2021                              49

12:46:15  1            MR. JACOBS:  Are you instructing him not

12:46:16  2    to answer?

12:46:17  3            MR. PATTERSON:  I'm instructing you not

12:46:18  4    to try to intimidate the witness by staring him down

12:46:22  5    across the table and asking him if you're intimidating

12:46:25  6    him.  That's what I'm telling you.  Ask a question and

12:46:28  7    let's get this done.

12:46:29  8        Q.   (By Mr. Jacobs)  Mr. Boriack, am I --

12:46:30  9            MR. PATTERSON:  Try to focus.  You have

12:46:33 10    asked very few bankruptcy questions today, so let's

12:46:35 11    focus on something important.

12:46:38 12        Q.   (By Mr. Jacobs)  Mr. Boriack, am I looking at

12:46:39 13    you right now?

12:46:39 14            MR. PATTERSON:  Ask a question.

12:46:41 15            MR. JACOBS:  I did.

12:46:42 16        Q.   (By Mr. Jacobs)  Mr. Boriack --

12:46:42 17            MR. PATTERSON:  I'm instructing him not

12:46:43 18    to answer.  This is wasting our time and you're just

12:46:47 19    trying to intimidate the witness.  Ask a question, not

12:46:49 20    whether you're looking at him or not.

12:46:51 21        Q.   (By Mr. Jacobs) Mr. Boriack --

12:46:52 22            MR. PATTERSON:  I'm looking at you.  Ask

12:46:54 23    a question.

12:46:55 24        Q.   Mr. Boriack, am I looking at you right now?

12:46:57 25            MR. PATTERSON:  Ask a question.

Ted Boriack - June 16, 2021                    50

12:46:58  1              Don't answer.

12:46:59  2        Q.   (By Mr. Jacobs)  Mr. Boriack, am I

12:46:59  3  intimidating you right now?

12:47:01  4              MR. PATTERSON:  Don't answer.

12:47:01  5              Ask a question.  And if you want to go to

12:47:04  6  the judge with that, go right ahead.

12:47:06  7        Q.   (By Mr. Jacobs)  Mr. Boriack, Line Item 42 on

12:47:10  8  page 4 of 19 of Exhibit No. 8 references project job

12:47:15  9  costing or work in progress reports.  And that box is

12:47:20 10  not checked, correct?

12:47:21 11        A.   That's correct.

12:47:22 12        Q.   Because there are none, correct?

12:47:26 13        A.   It's not applicable.

12:47:28 14        Q.   Why is it not applicable?

12:47:30 15        A.   Because we're shut down from an operating

12:47:34 16  standpoint and we don't have work in progress.  It's

12:47:39 17  not like we're a fabrication company that has work in

12:47:43 18  progress underway to other customers.  We're shut down.

12:47:50 19        Q.   Let's go to the next page, sir.  There's a

12:47:57 20  listing of employees here.  Do you see that, sir?

12:48:00 21        A.   I do.

12:48:00 22        Q.   One of them is Mr. Dickman.  Do you see that?

12:48:04 23        A.   Yes.

12:48:06 24        Q.   From a technical standpoint, is he an employee

12:48:09 25  of PASE or is he an independent contractor of PASE?

| | | |
|---|---|---|
| 12:48:12 | 1 | MR. PATTERSON:  Objection; calls for a |
| 12:48:14 | 2 | legal conclusion.  I don't even think the IRS knows the |
| 12:48:23 | 3 | answer to that question. |
| 12:48:24 | 4 | If you think you know, you can tell. |
| 12:48:27 | 5 | A.   Well, I'm not an attorney so I'd rather not |
| 12:48:34 | 6 | attempt a legal conclusion. |
| 12:48:36 | 7 | Q.   (By Mr. Jacobs)  Does PASE pay Social Security |
| 12:48:40 | 8 | taxes for Mr. Dickman? |
| 12:48:51 | 9 | A.   I don't believe so. |
| 12:48:53 | 10 | Q.   And you and Mr. Deyoe, you are not, in fact, |
| 12:49:04 | 11 | employees of PASE.  You are with Integral Power, |
| 12:49:06 | 12 | correct? |
| 12:49:13 | 13 | MR. PATTERSON:  Object; asked and |
| 12:49:15 | 14 | answered six times. |
| 12:49:34 | 15 | A.   I mean, I would defer to what I stated about |
| 12:49:37 | 16 | Mr. Dickman.  I mean, if it's a legal conclusion, I |
| 12:49:41 | 17 | don't -- I'm not an attorney, so I'm not going to make |
| 12:49:43 | 18 | a -- try to make a legal -- something that would be |
| 12:49:46 | 19 | deemed to be a legal response of some kind. |
| 12:49:49 | 20 | Q.   (By Mr. Jacobs)  Does PASE pay Social Security |
| 12:49:53 | 21 | taxes for the income that you and Mr. Deyoe receive? |
| 12:49:59 | 22 | A.   No. |
| 12:50:02 | 23 | Q.   Let's go to the next page.  Question 6 states |
| 12:50:23 | 24 | that PASE had engaged BDO to do its tax return, |
| 12:50:31 | 25 | correct? |

12:50:31  1        A.    That's correct.

12:50:33  2        Q.    But that BDO, upon learning that PASE had

12:50:37  3    filed Chapter 11, stopped work on the return for the

12:50:41  4    year 2020 and is referring PASE to a different

12:50:45  5    accounting firm to prepare the 2020 tax return.  Do you

12:50:47  6    see that?

12:50:47  7        A.    I do.

12:50:48  8        Q.    Is that information different now?

12:50:50  9        A.    Yeah.  I've had a --

12:50:52 10              MR. PATTERSON:  Hold on.

12:50:54 11              I'm going to object.  It calls for

12:50:56 12    speculation.  This isn't a continuing duty, some kind

12:50:58 13    of disclosure.  This is a snapshot in time.  Whether

12:51:02 14    it's different today or not doesn't have any bearing on

12:51:06 15    his operating report.

12:51:07 16              But go ahead and answer.

12:51:19 17        A.    The last time I talked to BDO, they were

12:51:25 18    trying to help us out with a return.  And I have not

12:51:33 19    had, since that -- since that call -- and I still need

12:51:36 20    to follow up with them -- but they were trying to

12:51:38 21    figure out a way to get it done.  And so BDO, perhaps

12:51:46 22    they might do it.  Perhaps it goes to another firm that

12:51:49 23    they're familiar with that would be, you know,

12:51:51 24    accommodating to help get the return out.

12:51:54 25        Q.    (By Mr. Jacobs)  Who did you talk to at BDO

| | | |
|---|---|---|
| 12:51:55 | 1 | about this? |
| 12:51:56 | 2 | A.   Brandon Pollard. |
| 12:51:58 | 3 | Q.   When did you talk to him? |
| 12:52:00 | 4 | A.   I'm not sure exactly what day it was. |
| 12:52:03 | 5 | Q.   Was it in May or was it in June? |
| 12:52:05 | 6 | A.   I believe it would be in June, as I recall. |
| 12:52:21 | 7 | Q.   Let's go to page 10 of 19.  This says that |
| 12:52:44 | 8 | the -- Question 24 is asking for the bills, |
| 12:52:49 | 9 | essentially, that PASE has received since it filed on |
| 12:52:53 | 10 | April 14, 2021, correct? |
| 12:52:57 | 11 | A.   Yes. |
| 12:53:00 | 12 | Q.   One of them is for Integral Power, correct? |
| 12:53:12 | 13 | A.   Yes. |
| 12:53:15 | 14 | Q.   That's the $37,500 a month, right? |
| 12:53:21 | 15 | A.   Yes. |
| 12:53:22 | 16 | Q.   The same amount that Integral Power has been |
| 12:53:26 | 17 | paid monthly since 2013, right? |
| 12:53:28 | 18 | A.   Yes. |
| 12:53:28 | 19 | Q.   When the plant was actually operating, right? |
| 12:53:35 | 20 | A.   Since 2013? |
| 12:53:36 | 21 | Q.   Yes. |
| 12:53:37 | 22 | A.   I know there was an adjustment there at some |
| 12:53:46 | 23 | point.  I don't know exactly what day it was; I'm not |
| 12:53:50 | 24 | sure.  But that's their -- that's the usually fee, |
| 12:53:54 | 25 | 37,5. |

Ted Boriack - June 16, 2021                    54

12:53:54  1      Q.   Per month?

12:53:58  2      A.   Per month.

12:53:59  3      Q.   And it's been that whether the plant was

12:54:02  4  operating and generating revenue from steam

12:54:05  5  electricity; and it's true even once it was no longer

12:54:08  6  having revenue, right?

12:54:11  7              MR. PATTERSON:   Objection; asked and

12:54:17  8  answered.

12:54:17  9      A.   That's -- that's the usual monthly operating

12:54:21 10  fee or management fee.

12:54:27 11      Q.   (By Mr. Jacobs)   There are references to some

12:54:30 12  invoices from the Dunn & Neal law firm.   Do you see

12:54:35 13  that?

12:54:35 14      A.   Yes.

12:54:36 15      Q.   One of them relates to Montgomery County, one

12:54:39 16  of them relates to Harris County, and then there's an

12:54:42 17  "other."   Do you see that?

12:54:43 18      A.   Yes.

12:54:43 19      Q.   Do you know what the "other" was for?

12:54:46 20      A.   I'd have to look at the invoice to see exactly

12:54:55 21  what that was about.

12:54:58 22      Q.   Have those bills from the Dunn & Neal law firm

12:55:03 23  been paid?

12:55:04 24      A.   No.

12:55:24 25      Q.   If you'll go to page 16 of 19.

| | | |
|---|---|---|
| 12:55:57 | 1 | MR. PATTERSON:  How should we tell |
| 12:56:01 | 2 | Mr. Belden how long it might be?  I'm not going to try |
| 12:56:05 | 3 | to pin you down, but just give him an idea. |
| 12:56:12 | 4 | MR. JACOBS:  I think an hour. |
| 12:56:18 | 5 | (Discussion off the record.) |
| 12:56:33 | 6 | MR. JACOBS:  Why don't we take a |
| 12:56:33 | 7 | five-minute break.  Let me look at my notes and see if |
| 12:56:37 | 8 | I can streamline some things. |
| 01:03:20 | 9 | (Off the record 12:56 p.m. to 1:03 p.m.) |
| 01:03:44 | 10 | Q.   (By Mr. Jacobs) First question:  What is the |
| 01:03:46 | 11 | last year that PASE has audited financial statements |
| 01:03:49 | 12 | from? |
| 01:03:50 | 13 | A.   2018. |
| 01:03:51 | 14 | Q.   Okay.  If you will take back out Exhibit |
| 01:04:02 | 15 | No. 3, which should be by your right elbow. |
| 01:04:07 | 16 | A.   Three? |
| 01:04:08 | 17 | Q.   Exhibit No. 3, your right elbow.  We are using |
| 01:04:12 | 18 | the numbering at the top, Mr. Boriack.  Go to page 28 |
| 01:04:20 | 19 | of 37.  Now this is the part where you get to blame |
| 01:04:28 | 20 | Mr. Deyoe because he said it was you on this stuff. |
| 01:04:31 | 21 | On page 28 of 37 of Exhibit 3 there is a |
| 01:04:37 | 22 | reference to income from January 1, 2021, to the filing |
| 01:04:43 | 23 | date, of $10,588.  Do you see that? |
| 01:04:52 | 24 | A.   Okay. |
| 01:04:52 | 25 | Q.   And it calls it, as the source, "other." |

Ted Boriack - June 16, 2021                    56

01:04:57  1   First off, what does that -- where did that $10,588

01:05:01  2   come from?

01:05:05  3        A.   I'm going to have to defer to the ledger on

01:05:43  4   that, the general ledger.  It would have it in there.

01:05:43  5        Q.   All right.

01:05:47  6             MR. PATTERSON:  If you really want to

01:05:48  7   know, I think I can tell you what I'm pretty sure it

01:05:51  8   is.  But I'm not going to jump in unless you're really

01:05:55  9   interested, or you're just trying to hold these guys'

01:05:58 10   feet to the fire.

01:05:59 11             MR. JACOBS:  Is that some insurance

01:06:00 12   refund or something?

01:06:01 13             MR. PATTERSON:  It's the sale of an

01:06:03 14   asset.  It's stuff that they sold.  That's my

01:06:07 15   recollection from preparing this is that it was

01:06:10 16   sales -- sale proceeds, right?

01:06:12 17             MR. JACOBS:  Well, I mean, I've got the

01:06:13 18   ledger.  So if he wants to refer to the ledger --

01:06:16 19             MR. PATTERSON:  That's even better.

01:06:17 20             MR. JACOBS:  I'd rather him refer to the

01:06:20 21   ledger for his testimony.

01:06:23 22             MR. PATTERSON:  Yes.

01:06:23 23             (Exhibit No. 31 marked.)

01:06:24 24        Q.   (By Mr. Jacobs)  I'm handing you the general

01:06:26 25   ledger which is from January through April of 2021.

01:06:38  1          Do you want some help or do you think you
01:06:54  2  can help me out?  I think I've got it, but I want to
01:06:59  3  make sure we have your testimony.
01:08:14  4      A.   It looks like -- hang on.  Let me just make
01:08:21  5  sure.  It looks like it's this refund.
01:08:52  6      Q.   Are you referring to the refund on January 13,
01:08:59  7  2021, for $43 and change?
01:09:01  8      A.   Yeah, that one along with -- I thought one of
01:09:09  9  these went against the insurance, so let me
01:09:12 10  double-check.
01:09:20 11          Yeah.  I mean, that would add up.  If you
01:09:22 12  took -- if you took the January 13th deposit and then
01:09:30 13  the March 5th deposit, those are refunds.  That would
01:09:37 14  add up to 10,588.
01:09:39 15      Q.   Okay.  While we're on this document, I just
01:09:41 16  want to ask a few questions about Exhibit 31.  If we go
01:09:53 17  to page 5 of 7...  Are you with me?
01:10:11 18      A.   Okay.
01:10:16 19      Q.   This is the general ledger that covers January
01:10:20 20  through the beginning of April 2021, right?
01:10:28 21      A.   Yeah, he's got it January through April 2021
01:10:33 22  in the heading, yeah.
01:10:34 23      Q.   And you see on page 5 of 7 there's a reference
01:10:37 24  to asset disposal and an amount of $35,500, right?
01:10:43 25      A.   Yes.

Ted Boriack - June 16, 2021                    58

01:10:50  1      Q.   And so that asset disposal and then there's

01:10:54  2   two refunds that you just referenced, that's the source

01:10:57  3   of inflow of money that PASE has had in the first three

01:11:00  4   quarters and change for the year, correct?

01:11:04  5      A.   For the first three quarters?

01:11:08  6      Q.   The first three months, excuse me.

01:11:16  7      A.   Yes.

01:11:17  8      Q.   If we go to the next page, there's a reference

01:11:21  9   to the expenses for Mr. Dickman that are a little over

01:11:27 10   $5,000.  Do you see that?

01:11:30 11      A.   Yes.

01:11:36 12      Q.   Including payments up until April 12, 2021,

01:11:40 13   right before the bankruptcy was filed, correct?

01:11:42 14      A.   I'm sorry.  Could you restate that?

01:11:47 15      Q.   Sure.  That includes -- there are payments

01:11:49 16   that are reflected on this ledger that go up until mid

01:11:55 17   April, right?

01:11:55 18      A.   Yes.

01:11:56 19      Q.   And we see at the bottom of page 6 of 7

01:12:05 20   there's office expenses for Integral Power of a little

01:12:08 21   over $6,000, right?

01:12:10 22      A.   Yes.

01:12:10 23      Q.   Including payments that were made the first

01:12:14 24   week of April, right?

01:12:15 25      A.   Yes.

Ted Boriack - June 16, 2021                          59

01:12:16  1        Q.    If you go to the next page, then there is
01:12:28  2    Integral Power fees of $150,000, right?
01:12:35  3        A.    Yes.
01:12:37  4        Q.    And then there's the Oxbow legal of a little
01:12:44  5    over $220,000 at the bottom, right?
01:12:47  6        A.    Yes.
01:12:48  7        Q.    And most of that is the Dunn & Neal law firm,
01:12:55  8    right?
01:12:55  9        A.    Yes.
01:12:57 10        Q.    But we also see Norton Rose and then the
01:13:02 11    Walker Patterson firms, right?
01:13:09 12        A.    Yes.
01:13:09 13        Q.    Let's go back to where -- let's put that
01:13:11 14    aside.  Let's go back to Exhibit No. 3, page 28 of 37.
01:13:24 15              So there are -- then Part 2 at the
01:13:27 16    bottom, there's certain payments or transfers to
01:13:31 17    creditors within 90 days before filing this case.  Do
01:13:37 18    you see that?
01:13:37 19        A.    Yes.
01:13:40 20        Q.    And it says, "List payments or transfers,
01:13:42 21    including expense reimbursements, to any creditor other
01:13:46 22    than regular employee compensation within 90 days
01:13:49 23    before filing this case, unless the aggregate value of
01:13:52 24    all property transferred to that creditor is less than
01:13:56 25    $6,285."  Do you see that?

01:13:59  1        A.    Yes.

01:13:59  2        Q.    And the box checked here was "none," right?

01:14:08  3        A.    Yes.

01:14:09  4        Q.    Now, we just saw, though, in Exhibit 31, that

01:14:13  5   there were payments made more than $6,825 within

01:14:18  6   90 days to a number of creditors, including Integral

01:14:25  7   Power, Dunn & Neal and others, correct?

01:14:48  8        A.    Yes.

01:14:49  9        Q.    But none of those payments are reflected here,

01:14:52 10   under Part 2, Question 3 of page 28 of 37 of Exhibit

01:14:58 11   No. 3, correct?

01:14:59 12        A.    Okay.

01:15:26 13        Q.    Do you agree?

01:15:29 14        A.    They are not listed there.

01:15:35 15        Q.    Do you know why not?

01:15:37 16        A.    No.   I'd have to -- I'd have to look at this.

01:15:41 17   I guess the -- I would just have to look at this

01:15:49 18   further to --

01:15:51 19        Q.    Let's go --

01:15:52 20        A.    -- you know, to explain.

01:15:54 21        Q.    -- to the next page.   The next page asks for

01:15:57 22   payments or other transfers of property made within one

01:15:59 23   year before filing this case that benefited any

01:16:02 24   insider.   Do you see that?

01:16:05 25        A.    Yes.

01:16:05  1        Q.   And that has a box of "none" there as well,

01:16:10  2   correct?

01:16:10  3        A.   Yes.

01:16:11  4        Q.   It does not -- Integral Power was not included

01:16:17  5   on that, was it?

01:16:20  6             MR. PATTERSON:   I'm going to object.   It

01:16:22  7   assumes facts not in evidence that they're an insider.

01:16:30  8   He's assuming that they are.

01:16:40  9        Q.   (By Mr. Jacobs)   Integral is not listed there,

01:16:42 10   is it?

01:16:44 11        A.   No.   I mean, Integral Power is not listed.

01:16:56 12        Q.   And is any -- is PASE Holdings listed there?

01:17:08 13   AIP PASE Holdings?

01:17:24 14        A.   No.

01:18:18 15             (Exhibit No. 38 marked.)

01:18:23 16        Q.   (By Mr. Jacobs)   Let me hand you Exhibit 38.

01:18:28 17   Mr. Boriack, Exhibit 38, sir.   I've handed you

01:18:42 18   Exhibit 38 which has a Bates number of PASE2042, which

01:18:48 19   is an e-mail from Nate Belden to you and Mr. Deyoe,

01:18:53 20   with a copy to John Ryan.   Do you see that?

01:18:55 21        A.   I see it.

01:18:56 22        Q.   It's dated December 23, 2020, right?

01:19:00 23        A.   I see it.

01:19:01 24        Q.   And in it, Mr. Belden writes to you:   "We need

01:19:05 25   PASE to transfer $61,000 to PASE Holdings to cover 2020

Ted Boriack - June 16, 2021                    62

01:19:13  1    expenses."  Do you see that?

01:19:14  2        A.    I see it.

01:19:15  3        Q.    Did you, in fact, follow Mr. Belden's

01:19:18  4    instructions and transfer from PASE to this entity

01:19:22  5    called PASE Holdings $61,000?

01:19:26  6        A.    I did.

01:19:27  7        Q.    And when he refers to PASE Holdings, is he

01:19:31  8    referring to AIP PASE Holdings?

01:19:39  9              MR. PATTERSON:  I'm going to object.  It

01:19:41 10    calls for speculation what somebody else was thinking.

01:20:55 11        A.    Yeah, that would be AIP PASE Holdings.

01:21:06 12        Q.    (By Mr. Jacobs)  And do they own 90 percent of

01:21:10 13    PASE?

01:21:10 14        A.    Yeah, I'm not -- off the top of my head, I'm

01:21:20 15    not quite sure on the percentages between the different

01:21:27 16    AIP Holdings and the other AIP, Inc. and all of that.

01:21:43 17              (Previously Marked Exhibit No. 53.)

01:21:43 18        Q.    I'm going to hand you Exhibit 53, then, if you

01:21:47 19    will take that one, sir.  This Exhibit 53 is the last

01:21:50 20    financial statement that PASE had.  It's by Briggs &

01:21:54 21    Veselka.  Do you see that?

01:21:55 22        A.    I see it.

01:21:56 23        Q.    I want to take your attention first to page 7.

01:22:02 24    Let me know when you are there.

01:22:09 25        A.    Okay.

Ted Boriack - June 16, 2021                             63

01:22:09  1        Q.    And my understanding is you were the --
01:22:12  2   between you and Mr. Boriack -- excuse me -- you and Mr.
01:22:18  3   Deyoe.  Let me start over.
01:22:19  4              Between you and Mr. Deyoe, you're the one
01:22:23  5   that deals with the auditors, correct?
01:22:27  6        A.    Yeah, I generally deal with the auditors.
01:22:33  7        Q.    And that included Briggs & Veselka, right?
01:22:36  8        A.    Including Briggs & Veselka.
01:22:37  9        Q.    Including on this 2018 audit that's reflected
01:22:44 10   in Exhibit 53, right?
01:22:46 11        A.    Yes.
01:22:49 12        Q.    Okay.  We're on page 7.  You'll see at the
01:22:51 13   top, there is a summary at the top of the ownership
01:22:55 14   structure of PASE.  Do you see that?
01:22:57 15        A.    I do.
01:22:57 16        Q.    It says PASE is a limited -- is an LP, right?
01:23:03 17        A.    Yes.
01:23:13 18              MR. PATTERSON:  I'm going to object as to
01:23:14 19   hearsay.  You're reading from a hearsay document.  It's
01:23:17 20   just hearsay.
01:23:19 21        Q.    (By Mr. Jacobs)  Did you review these after
01:23:21 22   Briggs & Veselka prepared them?
01:23:23 23        A.    Yes.
01:23:28 24        Q.    If there was something incorrect in them,
01:23:30 25   would you have told them?

01:23:34  1            MR. PATTERSON:  Objection; speculation.

01:23:36  2   Assumes facts not in evidence.

01:23:39  3        A.   I comment, you know, and we discuss it, but...

01:23:51  4        Q.   (By Mr. Jacobs)  Did you comment on this

01:23:52  5   paragraph up here describing the PASE corporate

01:23:56  6   structure and tell them they got something wrong?

01:23:59  7            MR. PATTERSON:  Objection; form of the

01:24:00  8   question.  It's a compound question.

01:24:04  9        Q.   (By Mr. Jacobs)  Let's break it down.

01:24:06  10           Did you review that paragraph after you

01:24:07  11  got the audit report from Briggs & Vaselka?

01:24:15  12       A.   I read over it.

01:24:19  13       Q.   Did you tell them -- after reading over it,

01:24:22  14  did you tell Briggs & Vaselka they got something wrong

01:24:26  15  in this paragraph at the top of page 7 of Exhibit 53?

01:24:30  16           MR. PATTERSON:  Objection; assumes facts

01:24:32  17  not in evidence that he would know if it was right or

01:24:35  18  wrong.

01:24:51  19       A.   I might have brought it to their attention.

01:24:54  20  But, I mean, it says Delaware -- it says Port Arthur

01:25:02  21  Steam Energy, LP and it's a Delaware Limited

01:25:05  22  Partnership.

01:25:06  23       Q.   (By Mr. Jacobs)  Okay.

01:25:09  24       A.   But, you know, just because I provide a

01:25:12  25  comment doesn't mean it always gets reflected.

01:25:14  1      Q.    Anything else in that paragraph that you think

01:25:17  2   is incorrect?

01:25:18  3             MR. PATTERSON:   Objection; assumes facts

01:25:20  4   not in evidence.   It assumes -- improperly assumes what

01:25:25  5   his prior testimony was.

01:27:20  6      A.    I would have to defer to Nate or get the

01:27:31  7   general partner to comment on the structure of these --

01:27:35  8   these other entities.

01:27:41  9      Q.    (By Mr. Jacobs) Okay.  I'll take you further

01:27:45 10   on this document to page 14.   And here there's a Note 7

01:28:09 11   entitled "Related Party Transactions."   Do you see

01:28:15 12   that?

01:28:15 13             MR. PATTERSON:   Object.   It's hearsay.

01:28:29 14      A.    What was the question?

01:28:30 15      Q.    (By Mr. Jacobs)  Sure.   You see there's this

01:28:31 16   section here under Note 7 on Related Party

01:28:36 17   Transactions.   Do you see that, sir?

01:28:37 18             MR. PATTERSON:   Objection.   It's hearsay.

01:28:40 19      A.    Yes.

01:28:40 20      Q.    (By Mr. Jacobs)  And this paragraph discusses

01:28:42 21   the arrangement between PASE and Integral Power,

01:28:46 22   correct?

01:28:47 23             MR. PATTERSON:   Objection; hearsay.

01:28:49 24   You're talking about a document that's hearsay, just

01:28:53 25   for the record.

Ted Boriack - June 16, 2021                    66

01:29:15  1        A.    I see the Note 7.

01:29:16  2        Q.    (By Mr. Jacobs)  Correct.  And Note 7

01:29:19  3   describes the contractual relationship between Integral

01:29:24  4   Power and PASE for the management services, right?

01:29:29  5                MR. PATTERSON:  I'm going to object.

01:29:30  6   It's hearsay.

01:29:53  7                You can answer.

01:29:53  8                THE WITNESS:  I can answer?

01:29:54  9                MR. PATTERSON:  Yes.

01:29:58 10        A.    Okay.

01:29:59 11        Q.    (By Mr. Jacobs)  It does?

01:30:00 12        A.    Yes.

01:30:00 13        Q.    Has anyone sought or elected to terminate the

01:30:04 14   agreement between PASE and Integral Power?

01:30:07 15                MR. PATTERSON:  Objection; assumes facts

01:30:09 16   not in evidence.

01:30:12 17        A.    No.

01:30:13 18        Q.    (By Mr. Jacobs)  This document here,

01:30:17 19   Exhibit 53, the 2018 financial statements, do you keep

01:30:24 20   a copy of these as part of your responsibilities under

01:30:27 21   Integral -- for Integral Power?

01:30:29 22        A.    What document?

01:30:30 23        Q.    Sure.  This document right in front of you.

01:30:32 24        A.    This document right here (indicating)?

01:30:37 25        Q.    Yes, sir.

Ted Boriack - June 16, 2021                    67

01:30:39  1        A.    Well, I receive a copy from the auditors.  I
01:30:47  2   keep a copy.
01:30:48  3        Q.    Okay.  Why do you keep a copy?
01:30:49  4        A.    Well, so that I can be able to reference it.
01:31:01  5   So --
01:31:01  6        Q.    As part of your -- sorry.
01:31:02  7        A.    Yeah, so it's to reference.
01:31:06  8        Q.    As part of your business?
01:31:08  9        A.    (No response.)
01:31:22  10       Q.    Do you keep it so you can do your job?
01:31:26  11                  MR. PATTERSON:  You can try all you want.
01:31:29  12   It's not a business record.  But keep asking.  Keep
01:31:32  13   going.
01:31:38  14                  Don't worry about it.  He's trying to get
01:31:40  15   around a problem and --
01:31:42  16                  MR. JACOBS:  There's no problem.
01:31:49  17       A.    Well, we keep a copy.
01:32:04  18       Q.    (By Mr. Jacobs)  Why?
01:32:07  19                  MR. PATTERSON:  Objection; relevance and
01:32:09  20   form.  It doesn't matter why.
01:32:26  21       A.    Well, it's, of course, provided to AIP for
01:32:43  22   approval and it's used for the tax return.
01:32:52  23                  (Exhibit No. 6 marked.)
01:32:52  24       Q.    (By Mr. Jacobs)  Let me hand you Exhibit
01:32:54  25   No. 6, sir.  I've handed you Exhibit No. 6 which is the

| | | |
|---|---|---|
| 01:33:28 | 1 | Chapter 11 (Subchapter V) Plan of PASE.  Do you see |
| 01:33:31 | 2 | that, sir? |
| 01:33:32 | 3 | A.   I see it. |
| 01:33:33 | 4 | Q.   If you'll go to the next page.  You see |
| 01:33:56 | 5 | there's a discussion here about the history of the |
| 01:33:59 | 6 | debtor.  Do you see that? |
| 01:34:02 | 7 | A.   On page 2? |
| 01:34:05 | 8 | Q.   Yes. |
| 01:34:13 | 9 | A.   I see it. |
| 01:34:14 | 10 | Q.   Who prepared this? |
| 01:34:18 | 11 | A.   Well, it's all familiar.  Who specifically |
| 01:35:22 | 12 | wrote it, I'm not quite sure.  Obviously somebody on |
| 01:35:28 | 13 | our team. |
| 01:35:30 | 14 | Q.   Looking at the second to the bottom paragraph, |
| 01:35:52 | 15 | there's a reference to a leak in the cold stacks.  Do |
| 01:36:05 | 16 | you see that? |
| 01:36:05 | 17 | A.   What page? |
| 01:36:11 | 18 | Q.   The same page, sir.  The second paragraph from |
| 01:36:14 | 19 | the bottom.  The bottom paragraph says, "This |
| 01:36:17 | 20 | bankruptcy is resulted..."  Do you see that?  The same |
| 01:36:25 | 21 | page, sir. |
| 01:36:26 | 22 | A.   Oh, okay.  You're going to another paragraph. |
| 01:36:29 | 23 | Okay. |
| 01:36:29 | 24 | Q.   No, it is a paragraph. |
| 01:36:30 | 25 | A.   Oh, here we go. |

Ted Boriack - June 16, 2021                                    69

01:36:31  1         Q.    All right.   To your knowledge, when did the
01:36:33  2    leak begin?
01:36:33  3         A.    Well, since the plant was shut down.
01:37:09  4         Q.    Do you have a month and a year, please?
01:37:13  5         A.    June 25, 2018.
01:37:15  6         Q.    That's when the plant was shut down, but I
01:37:17  7    guess my question is:   There's a reference here to a
01:37:20  8    leak.   When did you notice the leak?
01:37:30  9         A.    It was a couple of months ago.   I'd have to --
01:37:41 10    it was -- it was this year.   It was observed that there
01:37:52 11    was this liquid leaking out of the PASE fan housings.
01:38:03 12    And that is liquid that is coming down from the Oxbow
01:38:09 13    cold stacks.
01:38:10 14         Q.    Which cold stack?
01:38:11 15         A.    The cold stacks.
01:38:12 16         Q.    All of them?
01:38:14 17         A.    All of the cold stacks.
01:38:15 18         Q.    You think it's all of the cold stacks.   Do you
01:38:17 19    have any photographs?
01:38:18 20         A.    I'll have to -- I'll have to see.
01:38:21 21         Q.    Is there --
01:38:25 22         A.    But this liquid leaks into -- rain comes down
01:38:32 23    the cold stacks and then it leaks down into the PASE
01:38:35 24    equipment.
01:38:35 25         Q.    How do you know it's not just rain?

Ted Boriack - June 16, 2021                    70

01:38:37  1        A.   It is rain coming down the cold stacks into
01:38:39  2   the PASE equipment.   It's rain coming down the cold
01:38:42  3   stacks and washing the corrosive, acidic material off
01:38:49  4   the interior of the cold stack and then it flows down
01:38:52  5   into the fan housing.   But it comes from -- it comes
01:38:55  6   from the Oxbow cold stacks.
01:38:57  7        Q.   Have you written -- has PASE written to Oxbow
01:39:00  8   about this or communicated about this to --
01:39:03  9        A.   Yes.
01:39:03 10        Q.   Who?
01:39:03 11        A.   Nathan mentioned it to an Oxbow person.
01:39:12 12        Q.   When?
01:39:13 13        A.   I'd have to -- I'm not sure.   I'd have to
01:39:15 14   check.   But it was -- it was an Oxbow -- I'll have to
01:39:19 15   check with Nathan and see.   But he was contacted by an
01:39:25 16   Oxbow -- I believe he was called by an Oxbow person, a
01:39:29 17   female employee.   And they were acting as if this was
01:39:34 18   material coming from -- that we were generating.   But
01:39:39 19   it's actually Oxbow material that's coming from the
01:39:43 20   Oxbow equipment into our equipment.
01:39:46 21        Q.   Have you had the material analyzed by a
01:39:49 22   laboratory?
01:39:52 23        A.   Not yet but --
01:39:53 24        Q.   Do you have a sample?
01:39:54 25        A.   -- it's a -- we did take a sample.   But you

CONTINENTAL COURT REPORTERS, INC.
(713) 522-5080

01:39:59  1    can get it anytime it rains.

01:40:01  2         Q.    Where is the sample?

01:40:03  3         A.    It's in the PASE building.

01:40:04  4         Q.    In Port Arthur?

01:40:05  5         A.    In Port Arthur.

01:40:08  6         Q.    If the cold stacks got removed tomorrow, would

01:40:19  7    PASE then be in a position to remove all of its

01:40:23  8    equipment and buildings and clear the site?

01:40:25  9              MR. PATTERSON:   Objection; calls for

01:40:27  10   speculation.  Wild speculation, actually.

01:40:45  11        A.    Well, the cold -- the cold stacks are

01:40:47  12   definitely a safety concern, so we would have to

01:40:53  13   assess.  Upon removal of the stacks, we would have to

01:40:55  14   assess and then see what the site looks like.

01:40:59  15             And the corrosive liquid into the PASE

01:41:02  16   equipment is also a concern because now you've got

01:41:06  17   this -- this stuff that's -- you know, it's corrosive,

01:41:14  18   it's acidic.  And so you've got to evaluate that and

01:41:19  19   just see, you know, what is it going to take to

01:41:22  20   actually remove the equipment that's affected by that.

01:41:25  21   So we would have to assess.

01:41:35  22        Q.    (By Mr. Jacobs)  Well, let's step back for a

01:41:37  23   second.

01:41:37  24             The cold stacks aren't preventing the

01:41:40  25   removal of PASE's office building, for example, right?

Ted Boriack - June 16, 2021                    72

01:41:44  1            MR. PATTERSON:  Objection; argumentative

01:41:46  2   and assumes facts not in evidence.

01:41:49  3        A.    The stacks are 185 feet tall.

01:41:55  4        Q.    (By Mr. Jacobs)  Okay.

01:41:56  5        A.    And I know when the -- in the prior stack

01:41:59  6   failure of No. 3, I mean, there's the -- there is a

01:42:04  7   mass damper.  It's a large -- it's a very heavy ring at

01:42:08  8   the very top of the stack.  It's a ring.  It's a wheel.

01:42:12  9   Depending upon how it falls, that very heavy steel

01:42:16 10   ring, who knows where it's going to go.  I mean, it's

01:42:24 11   speculation, for sure, where it's going to go; but for

01:42:26 12   sure it's a safety hazard.  And, you know, you have

01:42:31 13   to -- you have to know that it's safe.

01:42:34 14        Q.    We'll try this again.  How far away is the

01:42:40 15   water treatment plant?

01:42:42 16            MR. PATTERSON:  Objection to the form of

01:42:44 17   the question.

01:42:45 18        Q.    (By Mr. Jacobs)  And the stacks.

01:42:56 19        A.    I would say close enough to be within impact

01:42:58 20   of a falling stack.  Because if you're 185 feet tall

01:43:03 21   and you have something that's effectively a wheel at

01:43:06 22   the top of it, if it falls, it could -- that wheel

01:43:13 23   could roll a very long way.  It depends how it goes.

01:43:17 24   But it's going to have a lot of energy when it's

01:43:20 25   falling.

Ted Boriack - June 16, 2021                          73

01:43:20  1          Q.    When was the last time you were at PASE's
01:43:23  2    facility?
01:43:24  3          A.    This past Sunday and Monday.
01:43:27  4          Q.    Did you wear a hard hat?
01:43:29  5          A.    I caught myself, initially when I first -- I
01:43:33  6    did put on a hard hat, yes.  I did --
01:43:35  7                    MR. PATTERSON:  I'm going to object.
01:43:37  8                    You don't need to make faces or comments
01:43:39  9    on his testimony.  All right?  If you're aghast or
01:43:42 10    you're surprised, maybe you ought to have a different
01:43:48 11    role in this litigation.
01:43:50 12                    MR. JACOBS:  Oh, please.
01:43:50 13                    MR. PATTERSON:  But you're the lawyer,
01:43:50 14    so...
01:43:50 15                    MR. JACOBS:  You can't possibly be
01:43:51 16    lecturing me.  I'm asking a simple question.
01:43:52 17                    MR. PATTERSON:  I am lecturing you
01:43:54 18    because of the way you're acting.  All right?  Ask him
01:43:56 19    a question and he'll answer it.
01:43:56 20                    MR. JACOBS:  I did ask him.
01:43:57 21                    MR. PATTERSON:  Okay.  We don't need your
01:44:03 22    comments.
01:44:03 23          Q.    (By Mr. Jacobs)  Did you wear your hard hat
01:44:05 24    when you first --
         25                    MR. PATTERSON:  We don't need your

Ted Boriack - June 16, 2021                    74

```
 1   comments.
 2             THE REPORTER:  I didn't get your
 3   question.  I'm sorry.  I did not get your question.
 4        Q.   (By Mr. Jacobs)  Did you wear your hard hat
01:44:07  5   when you first set foot on PASE property last weekend?
01:44:10  6             MR. PATTERSON:  Objection; relevance.
01:44:12  7        A.   No, I did not wear a hard hat when I first
01:44:17  8   stepped on the PASE property because you're stepping
01:44:20  9   out of a car from the parking lot, and normally you
01:44:23 10   don't wear a hard hat when you first walk into the
01:44:26 11   building.
01:44:26 12        Q.   (By Mr. Jacobs)  How long did you go without
01:44:27 13   wearing a hard hat?
01:44:29 14             MR. PATTERSON:  Objection; relevance.
01:44:31 15        A.   I'm not sure.  But I caught -- I noticed -- I
01:44:35 16   was wearing a hat.  Okay?  So I was wearing a hat and I
01:44:40 17   knew I had a hat on and then I caught myself and then I
01:44:44 18   put on my hard hat.
01:44:45 19        Q.   (By Mr. Jacobs)  What kind of hat?
01:44:47 20             MR. PATTERSON:  Objection; relevance.
01:44:49 21        A.   It was a hard hat.
01:44:51 22             MR. PATTERSON:  Objection; relevance.  Do
01:44:53 23   you want to know what brand shirt he wears?  What kind
01:44:56 24   of shoes he might have on?
01:44:58 25        Q.   (By Mr. Jacobs)  Let's go to the next page.
```

Ted Boriack - June 16, 2021                    75

01:45:04  1   If you will go to the next page of that document.

01:45:08  2                   I want to ask about the Chapter 7 fees of

01:45:15  3   a million dollars.  What's the basis of that?

01:45:17  4        A.   I would have to defer to counsel on that

01:45:32  5   number, on the potential cost of what it -- what that

01:45:34  6   may take.

01:45:35  7        Q.   Is that fee amount just for the Patterson law

01:45:41  8   firm?

01:45:41  9                   MR. PATTERSON:  Objection; assumes facts

01:45:43 10   not in evidence and it's a legal conclusion and it's

01:45:46 11   just wrong, so...

01:45:58 12                   And we can cut through this.  A Chapter 7

01:46:01 13   fee is a Chapter 7 trustee fee and it's statutory.  We

01:46:05 14   can go look right at the statute and do the math or we

01:46:11 15   can do it the other way.  But I'm just trying to help

01:46:14 16   you.

01:46:14 17                   MR. JACOBS:  I'm trying to get some sworn

01:46:16 18   testimony from a witness who was put up on this topic.

01:46:19 19   And I'm really struggling with that when I'm asking

01:46:22 20   questions.

01:46:22 21                   MR. PATTERSON:  Right.  And my point is,

01:46:23 22   I know and, look, we can go through this exercise.

01:46:25 23   It's either that or you're really interested in the

01:46:28 24   information.

01:46:28 25                   MR. JACOBS:  I am interested.

01:46:29  1              MR. PATTERSON:  And I've already told you

01:46:29  2      I'm pretty sure you're not interested in the

01:46:36  3      information.

01:46:36  4              MR. JACOBS:  I am interested in the

        5      testimony.

        6              MR. PATTERSON:  Just in case --

        7              MR. JACOBS:  But information from you is

        8      not --

        9              THE REPORTER:  I'm not getting it when

01:46:38 10      you're talking over each other.

01:46:38 11              MR. PATTERSON:  It's a statutory, set

01:46:40 12      amount; so, you're not going to get it from any witness

01:46:43 13      if you don't know.  So, to the extent you wanted to

01:46:48 14      know -- which I doubt -- that's what it is.  To the

01:46:51 15      extent you want to just go around and around with a

01:46:56 16      witness who is not a lawyer, be my guest.  Knock

01:46:59 17      yourself out.  You only have seven hours and you're

01:47:02 18      down to about to three more, so carry on...

01:47:02 19      Q.   (By Mr. Jacobs)  As I understand it, you don't

01:47:04 20      know what that million dollars for Chapter 7 fees is,

01:47:08 21      right?  Is that your testimony?

01:47:09 22      A.   Like I said, I would have to defer to counsel

01:47:14 23      on how a Chapter 7 fee is calculated.

01:47:16 24      Q.   What about the administrative expenses of

01:47:18 25      $750,000?

Ted Boriack - June 16, 2021                         77

01:47:19  1        A.    I'm sorry.  What was the question?

01:47:58  2        Q.    Sure.  Can you tell me what the administrative

01:48:02  3   expenses of $750,000 estimated here constitutes?

01:48:12  4        A.    I think just what it says.  It's the

01:48:15  5   administrative expenses associated with the

01:48:19  6   performance.

01:48:20  7        Q.    Okay.  Who receives that expense?

01:48:21  8        A.    Well, the entities and individuals that are

01:48:48  9   administrating -- administering this liquidation.

01:48:52 10        Q.    Would that include Integral Power?

01:48:59 11              MR. PATTERSON:  Object to the form of the

01:49:00 12   question.  You're assuming facts that aren't in

01:49:06 13   evidence.  It's just a fundamental "not understanding

01:49:12 14   what you're reading."  And you're trying to ask

01:49:15 15   questions to a witness that doesn't have the

01:49:16 16   information you think you need, but you don't even know

01:49:19 17   what you're looking at.

01:49:21 18              It's Chapter 7 admin expenses.  It's the

01:49:25 19   comparative liquidation analysis to a Chapter 7.  All

01:49:29 20   right?  So try to figure out what you're reading before

01:49:39 21   you try to ask a witness questions, legal questions,

01:49:43 22   that the bankruptcy lawyers or the bankruptcy judge is

01:49:47 23   going to know exactly what it is.  But we are wasting

01:49:50 24   time on this.  But go ahead.  Knock yourself out again.

01:49:57 25        Q.    (By Mr. Jacobs)  Who receives the $750,000, if

CONTINENTAL COURT REPORTERS, INC.
(713) 522-5080

Ted Boriack - June 16, 2021                     78

01:50:03 1    you know?

01:50:04 2        A.   Yeah, I would defer to counsel because it

01:50:09 3    sounds like it's a -- it's a legal calculation.

01:50:16 4        Q.   Let's go to the next section at the bottom

01:50:19 5    here.  There's a statement in the paragraph that begins

01:50:24 6    "the debtor."

01:50:24 7        A.   Yes.

01:50:26 8        Q.   The second to the last sentence says, "The

01:50:28 9    debtor will have sufficient projected disposable

01:50:32 10   income, as defined by Section 1191(d) of the Bankruptcy

01:50:36 11   Code, to fund the payments required by the plan."  Do

01:50:40 12   you see that?

01:50:40 13       A.   I see that.

01:50:41 14       Q.   Okay.  What is the debtor's projected

01:50:43 15   disposable income?

01:50:44 16       A.   Well, it's defined under this 1191(d) of the

01:52:21 17   code, of the bankruptcy code.  And so that's a --

01:52:34 18   that's obviously a legal reference.

01:52:35 19       Q.   I'm going to ask you as a business person:

01:52:38 20   What is the Debtor PASE's projected disposable income

01:52:45 21   in the future?

01:52:45 22            MR. PATTERSON:  Objection; relevance.

01:52:48 23   It's got nothing to do with anything.  You're just

01:52:51 24   wasting our time here.

01:52:55 25            What's the connection to that, his

CONTINENTAL COURT REPORTERS, INC.
(713) 522-5080

01:52:59  1    business knowledge of some made up phrase, to this

01:53:02  2    case?  What is it?  Any connection whatsoever.  Any

01:53:06  3    relation to the case, the plan, anything.

01:53:09  4            MR. JACOBS:  It says that right here in

01:53:10  5    the plan, and I'm just asking --

01:53:12  6            MR. PATTERSON:  That's a legal term.

01:53:14  7    Open the code and read it.  You've asked him something

01:53:17  8    completely different.  You've asked him to make up some

01:53:19  9    term that he might have some belief or understanding of

01:53:22 10    as a businessman.  What does that have to do with a

01:53:25 11    bankruptcy term that's defined?  Tell me.  Anything.

01:53:28 12    Any connection.

01:53:34 13        Q.   (By Mr. Jacobs)  Mr. Boriack, can you answer

01:53:36 14    my question, please?

01:53:37 15            MR. PATTERSON:  Go ahead.  But I'm

01:53:39 16    telling you:  Why are we wasting our time, him talking

01:53:42 17    about a business term, when we have a defined

01:53:46 18    bankruptcy term in the plan?  What relation does it

01:53:49 19    have to the plan, the case, the debtor, bankruptcy in

01:53:55 20    general?  Just give me an idea.

01:53:59 21        Q.   (By Mr. Jacobs)  Mr. Boriack, can you answer

01:54:01 22    my question?

01:54:01 23        A.   Okay.

01:54:04 24            MR. PATTERSON:  What he wants you to do

01:54:05 25    is just make up a term and tell him what you think you

Ted Boriack - June 16, 2021                    80

01:54:09  1    might -- it might mean, for some reason, as a

01:54:12  2    businessman.  If you can.

01:54:34  3        A.   So let me make sure I understand the question

01:54:37  4    right.  What is the question now, now that we've had

01:54:40  5    all this?

01:54:40  6        Q.   (By Mr. Jacobs)  What is the disposable income

01:54:43  7    that PASE is projecting to have in the future?

01:54:46  8                 MR. PATTERSON:  Objection; asked and

01:54:47  9    answered twice.

01:54:49 10                 That's not the question you just asked

01:54:51 11    him.  The last question was:  As a businessman, and you

01:54:57 12    have a term, what does it mean to you, disposable

01:55:02 13    income as a businessman.  That was the question.

01:55:14 14        A.   Well, disposable income, I mean, it would come

01:55:30 15    from the -- from the liquidation.  And so -- and

01:55:36 16    that's -- this legal reference is defined by the

01:55:39 17    bankruptcy code, so I would say it's -- it's got a --

01:55:43 18    it's got a legal definition and I am not an attorney.

01:55:47 19        Q.   (By Mr. Jacobs)  You referenced "liquidation."

01:55:49 20    Are you referring to liquidation of the PASE's assets?

01:55:53 21        A.   Yes.

01:55:53 22        Q.   And can you tell me:  When is PASE projecting

01:55:57 23    that that's going to occur?  And I'll have a second

01:56:01 24    question after that.

01:56:02 25        A.   Well, it has already begun.  And then so we're

Ted Boriack - June 16, 2021                            81

01:56:10  1  moving forward with liquidation of the remaining

01:56:18  2  assets.  It does have to be done safely, so...

01:56:21  3      Q.   How much money does PASE project it will

01:56:25  4  receive from the liquidation of those assets?

01:56:32  5      A.   Well, I would have to defer to the projected

01:56:37  6  valuations.  And it's -- it's one of those things

01:56:42  7  where, you know, a buyer -- if the buyer is -- you

01:56:50  8  know, if a piece of equipment or some material is

01:56:52  9  offered and the buyer is there, then obviously the

01:56:55  10  transaction occurs, just like we've experienced in --

01:56:59  11  in early April, you know.  So it's a matter of

01:57:05  12  getting -- getting all of the materials, you know, and

01:57:07  13  the equipment out and finding the buyers and the buyers

01:57:13  14  being available.

01:57:16  15      Q.   And the second sentence here refers to

01:57:18  16  payments required by the plan.  Do you see that?

01:57:23  17      A.   Yes.

01:57:23  18      Q.   What are the payments that are going to be

01:57:26  19  required by this plan?

01:57:27  20      A.   I would just defer to this document as it's

01:58:19  21  described here.

01:58:27  22      Q.   The next thing says the term of the plan is

01:58:31  23  estimated to be 60 months.  Do you see that?

01:58:34  24      A.   Yes.

01:58:34  25      Q.   That's five years, right?

Ted Boriack - June 16, 2021                            82

01:58:37  1      A.    Yes.

01:58:37  2      Q.    Okay.  What's the basis for the term of the

01:58:40  3  plan taking five years?

01:58:41  4      A.    I believe that's the -- the allowable time.

01:59:00  5  And so it was applied to allow for the maximum time

01:59:09  6  possible for the -- for the liquidation.  Not that it

01:59:12  7  would take that long, but you wouldn't want to put down

01:59:21  8  some number of months and then you need one additional

01:59:24  9  month and there would have been additional time that

01:59:30 10  would have been available.  So I think the -- that's

01:59:35 11  how we got to the 60 months.

01:59:42 12      Q.    Let's go to page 8 of 12.  There's a reference

01:59:57 13  there to treatment of Class 3 nonpriority unsecured

01:59:59 14  claims allowed under Section 502.  Do you see that?

02:00:01 15      A.    Yes.

02:00:02 16      Q.    Do you know who is in Class 3?

02:00:06 17      A.    To me, it seems like a legal designation, so I

02:00:31 18  would defer to counsel.

02:00:31 19      Q.    If you'll stay on that page.  I'm not done

02:00:35 20  yet.  Stay with me.

02:00:36 21            Class 3 is referenced as being impaired.

02:00:40 22  Can you explain why that class of claimants is listed

02:00:45 23  as impaired?

02:00:49 24            MR. PATTERSON:  Objection; calls for a

02:00:50 25  legal conclusion.

02:00:56  1        A.    That, to me, is a -- is a legal designation or

02:01:01  2    definition, so I'd defer to counsel.

02:01:19  3        Q.    (By Mr. Jacobs)  Can you go to page 11 of 12?

02:01:22  4    There's a reference here to "effective date."  Do you

02:01:24  5    know when the effective date is, at the bottom there,

02:01:33  6    of discharge?

02:01:46  7                MR. PATTERSON:  If you want the answer,

02:01:47  8    I'll give it to you.  But you can dance if you want.

02:01:50  9                MR. JACOBS:  If he knows, he knows.

02:01:52 10                MR. PATTERSON:  I'm not trying to butt

02:01:54 11    in, but you're asking a pretty simple question.

02:01:56 12                MR. JACOBS:  Okay.  Let's move on, then.

02:01:58 13        Q.    (By Mr. Jacobs)  Let me ask this question,

02:01:59 14    Mr. Boriack, about the plan.  There's an amount of

02:02:05 15    cash, 200-odd thousand dollars, and then there's

02:02:09 16    $3-plus million in equipment, et cetera.  Agreed?

02:02:12 17        A.    Okay.

02:02:15 18        Q.    And as I understand it, in broad strokes, the

02:02:23 19    plan is to take those hard assets -- the trucks, the

02:02:26 20    equipment, et cetera -- and to sell them and get cash

02:02:29 21    for that, right?

02:02:30 22        A.    Yes.

02:02:32 23        Q.    Okay.  What is that cash going to be used for?

02:02:38 24        A.    Well for performing the plan and, you know,

02:02:58 25    meeting whatever obligations are -- that are under the

Ted Boriack - June 16, 2021                          84

02:03:02  1    plan.

02:03:03  2        Q.    Okay.  Let me unpack this a little bit.

02:03:07  3               Is it going to be used to pay for

02:03:09  4    lawyers?

02:03:09  5        A.    Well, I would expect that along the way there

02:03:24  6    would be some legal fees, since it's a Chapter 11

02:03:27  7    proceeding and it does involve various claims that are

02:03:36  8    to be settled or to be finalized in some way.  So I

02:03:44  9    would suppose there would be legal fees somehow or

02:03:47 10    another.

02:03:48 11        Q.    And would you expect that the legal fees --

02:03:49 12    understanding the plan, is the plan to pay the legal

02:03:50 13    fees on an hourly basis or on some other arrangement

02:03:54 14    with the lawyer pursuing the legal claims?

02:04:00 15        A.    I think it depends on the legal engagement and

02:04:08 16    whatever is agreed to as part of that engagement.

02:04:12 17        Q.    Do you have a -- what is PASE's current

02:04:15 18    thinking on what that is going to be?

02:04:18 19        A.    On whether or not we're going to pay an

02:04:24 20    attorney hourly?

02:04:26 21        Q.    Or on some other basis, yeah.

02:04:28 22        A.    I can't -- I can't say today just, you know,

02:04:32 23    what the future holds on whether or not it's going to

02:04:35 24    be hourly or some other arrangement.

02:04:39 25        Q.    Under the plan, going forward, does it include

Ted Boriack - June 16, 2021                    85

02:04:42  1    continuing -- does it include continuing to pay

02:04:45  2    Integral Power $450,000 a year?

02:04:48  3         A.   I think we'll just have to assess it and

02:05:03  4    evaluate that.

02:05:27  5                    MR. JACOBS:  Mr. Boriack, thank you for

02:05:33  6    your time, sir.

02:05:34  7                    I'll pass.

02:05:35  8                    MR. PATTERSON:  I'll reserve my

02:05:38  9    questions.

         10                    (Examination concluded at 2:05 p.m.)

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

```
 1              CHANGES AND SIGNATURE

 2   WITNESS NAME: TED BORIACK

 3   DATE OF DEPOSITION:  JUNE 16, 2021

 4   PAGE    LINE      CHANGE            REASON

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

1        I, TED BORIACK, have read the foregoing
deposition and hereby affix my signature that same is
2   true and correct, except as noted above.

3

4

5        _____
TED BORIACK
6

7   THE STATE OF _____:

8   COUNTY OF _____:

9

10       Before me, _____, on
this day personally appeared TED BORIACK, known to me
(or proved to me under oath or through _____)
11  (description of identity card or other document) to be
the person whose name is subscribed to the foregoing
12  instrument and acknowledged to me that they executed
the same for the purposes and consideration therein
13  expressed.

14

15       Given under my hand and seal of office
this _____ day of _____, _____.

16

17

18       _____
Notary Public in and for
The State of _____
19

My Commission Expires _____
20

21

22

Job No. 01-80080
23

24

25

```
1              IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE SOUTHERN DISTRICT OF TEXAS
2                         VICTORIA DIVISION

3                                    :
    In re:                           :   CHAPTER 11 (SUBCHAPTER V)
4                                    :
    PORT ARTHUR STEAM                :   CASE NO. 21-60034
5   ENERGY, LP                       :
                                     :
6            Debtor.                 :

7                    REPORTER'S CERTIFICATION
              RULE 2004 EXAMINATION OF TED BORIACK
8                    TAKEN ON JUNE 16, 2021

9       I, ANDREA L. DESORMEAUX, Certified Shorthand
    Reporter, hereby certify to the following:
10

        That the witness, TED BORIACK, was duly sworn by
11  the officer and that the transcript of the oral
    deposition is a true record of the testimony given by
12  the witness;

13      That the deposition transcript was submitted on
    _____, _____, to the witness or to the
14  attorney for the witness for examination, signature and
    return to me by _____, _____;
15

        That the amount of time used by each party at the
16  deposition is as follows:

17      Mr. Jacobs    - (02:29:41)
        Mr. Patterson - (00:00:00)
18

        That pursuant to information given to the
19  deposition officer at the time said testimony was
    taken, the following includes counsel for all parties
20  of record:

21

        Mr. Kevin T. Jacobs, Mr. Michael S. Goldberg, and
22      Mr. David R. Eastlake, attorneys for the Creditor
    Oxbow Calcining, LLC.
23       Mr. Johnie J. Patterson, II, attorney for the
    Debtor Port Arthur Steam Energy, LP.
24

        I further certify that I am neither counsel for,
25  related to, nor employed by any of the parties or
```

1    attorneys in the action in which this proceeding was
     taken, and further that I am not financially or
2    otherwise interested in the outcome of the action.

3
         Certified to by me this _____ day of _____,
4    2021.

5

6
                         _____
7                        ANDREA L. DESORMEAUX, TEXAS CSR NO. 4835
                         Expiration Date:  July 31, 2022
8                        CONTINENTAL COURT REPORTERS, INC.
                         Firm Registration No. 61
9                        Expiration Date:  January 31, 2023
                         Two Riverway Building
10                       2 Riverway, Suite 750
                         Houston, Texas 77056
11                       (713) 522-5080

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    FURTHER CERTIFICATION

2

3       The original deposition was/was not returned to the
deposition officer on _____;

4       If returned, the attached Changes and Signature
page contains any changes and the reasons therefor;

5

6       If returned, the original deposition was delivered
to Mr. Kevin T. Jacobs, Texas Bar No. 24012893,
Custodial Attorney;

7

8       That $_____ is the deposition officer's charges
to the Creditor's attorney for preparing the original
deposition transcript and any copies of exhibits;

9

10      That the deposition was delivered in accordance
with Rule 30(f), and that a copy of this certificate
was served on all parties shown herein on and filed

11      with the Clerk.

12      Certified to by me this _____ day of _____,
2021.

13

14

15

16      _____
        ANDREA L. DESORMEAUX, TEXAS CSR NO. 4835
        Expiration Date:  July 31, 2022
17      CONTINENTAL COURT REPORTERS, INC.
        Firm Registration No. 61
18      Expiration Date:  January 31, 2023
        Two Riverway Building
19      2 Riverway, Suite 750
        Houston, Texas 77056
20      (713) 522-5080

21

22

23

24

25

## $

**$10,588 (2)**
55:23;56:1
**$12,000 (8)**
15:2,5,13;16:3,6;
18:14,15;29:24
**$150,000 (1)**
59:2
**$163,332.19 (2)**
26:10,20
**$2 (2)**
34:21,24
**$209,161.14 (2)**
29:2,14
**$216,728.01 (1)**
28:18
**$220,000 (1)**
59:5
**$228,866,229 (1)**
34:12
**$300 (1)**
18:18
**$35,500 (1)**
57:24
**$37,500 (1)**
53:14
**$3-plus (1)**
83:16
**$42,460.94 (1)**
27:15
**$43 (1)**
57:7
**$450,000 (2)**
32:25;85:2
**$5,000 (1)**
58:10
**$50,000 (1)**
20:13
**$51,384.50 (1)**
27:22
**$6,000 (1)**
58:21
**$6,285 (1)**
59:25
**$6,825 (1)**
60:5
**$61,000 (2)**
61:25;62:5
**$64,000 (2)**
30:23;31:8
**$750,000 (3)**
76:25;77:3,25
**$85,000 (2)**
33:4,17
**$966,000 (1)**
34:6

## A

**able (2)**
20:19;67:4

**above (1)**
23:21
**accommodating (1)**
52:24
**according (1)**
39:9
**account (6)**
14:10;25:23,25;
30:8;36:14,15
**accountant (4)**
18:10;44:13,16,18
**accountants (2)**
25:13;28:6
**accounting (11)**
9:14;15:16;17:22;
21:25;25:11;31:1,11,
13;39:16;42:11;52:5
**accounts (5)**
25:19;26:3;27:7,15;
40:2
**accrual (1)**
42:10
**accrued (1)**
27:21
**acidic (2)**
70:3;71:18
**acknowledge (1)**
46:8
**across (1)**
49:5
**act (1)**
48:10
**acting (3)**
46:2;70:17;73:18
**activities (3)**
32:13;39:8,17
**actual (2)**
31:2;32:16
**actually (8)**
18:16;31:6,8;40:5;
53:19;70:19;71:10,20
**add (2)**
57:11,14
**additional (4)**
18:22;44:23;82:8,9
**address (1)**
8:5
**adjustment (1)**
53:22
**admin (1)**
77:18
**administering (1)**
77:9
**administrating (1)**
77:9
**administrative (3)**
76:24;77:2,5
**affairs (1)**
25:3
**affected (1)**
71:20
**again (5)**
30:15;40:10;43:22;

72:14;77:24
**against (7)**
20:3;21:4,18;31:4,
20,22;57:9
**aggregate (1)**
59:23
**aghast (1)**
73:9
**ago (3)**
28:4;37:23;69:9
**agree (2)**
28:15;60:13
**Agreed (3)**
6:2;83:16;84:16
**agreement (12)**
4:12;19:4,7,9,12,14,
16,19,21,22;23:22;
66:14
**ahead (6)**
9:1;48:9;50:6;
52:16;77:24;79:15
**AIP (8)**
10:25;11:15;61:13;
62:8,11,16,16;67:21
**allow (1)**
82:5
**allowable (1)**
82:4
**allowed (1)**
82:14
**almost (1)**
33:17
**along (4)**
11:6;18:23;57:8;
84:5
**always (1)**
64:25
**America (1)**
36:13
**amount (23)**
15:2,18;16:6,7,18,
21;17:6,10,12,13;
18:13,16,17;21:18;
22:7;26:21;28:10;
31:22;53:16;57:24;
75:7;76:12;83:14
**amounts (4)**
17:19;26:13,16;
42:24
**analysis (1)**
77:19
**analyzed (1)**
70:21
**annual (1)**
19:15
**annually (1)**
34:24
**answered (10)**
8:1,16;15:15,20,20;
22:18;40:3;51:14;
54:8;80:9
**applicable (2)**
50:13,14

**applied (1)**
82:5
**Appraisal (3)**
13:16;14:23;24:4
**appropriateness (1)**
26:23
**approval (1)**
67:22
**approximately (3)**
19:22;33:3;34:23
**April (23)**
19:1;20:6;21:9;
25:25;28:25;36:4,4,4,
10,10;37:25;38:7;
40:4,5,8;53:10;56:25;
57:20,21;58:12,17,24;
81:11
**AR (1)**
26:6
**area (1)**
16:13
**argue (1)**
45:7
**argument (1)**
46:13
**Argumentative (8)**
8:1,16;9:9;17:16;
43:13;45:4;48:21;
72:1
**arise (1)**
39:20
**arms (1)**
38:21
**arose (1)**
20:24
**around (5)**
38:21;43:23;67:15;
76:15,15
**arrangement (5)**
20:5;24:12;65:21;
84:13,24
**Arthur (10)**
4:12,13;13:20;
24:10,17;37:9,12;
64:20;71:4,5
**aside (3)**
11:24;24:23;59:14
**assess (4)**
71:13,14,21;85:3
**assessment (1)**
13:23
**asset (13)**
4:13;11:13;27:7;
28:1;36:18,21;37:16;
38:6,12;39:10;56:14;
57:24;58:1
**assets (13)**
19:11;25:20;26:24;
27:12;37:7,11,22;
38:10,19;80:20;81:2,
4;83:19
**assistant (1)**
45:11

**associated (8)**
6:17;7:20;8:6;
10:22;15:10;33:24;
39:25;77:5
**assumed (2)**
23:16,19
**assumes (10)**
9:8;61:7;64:2,16;
65:3,4,4;66:15;72:2;
75:9
**assuming (3)**
43:13;61:8;77:12
**attach (1)**
45:16
**attempt (1)**
51:6
**attention (2)**
62:23;64:19
**attorney (6)**
17:20;22:24;51:5,
17;80:18;84:20
**attorneys (1)**
22:21
**audit (6)**
10:2,6,9,24;63:9;
64:11
**audited (4)**
9:7,14;10:13;55:11
**auditor (1)**
9:6
**auditors (5)**
8:22,24;63:5,6;67:1
**authorities (1)**
24:7
**authorized (1)**
11:15
**auto (1)**
44:15
**available (3)**
45:16;81:14;82:10
**aware (2)**
9:6;13:2
**away (1)**
72:14

## B

**back (7)**
14:17;24:24;46:19;
55:14;59:13,14;71:22
**Balance (5)**
6:21;7:21;25:5,6,9
**ballpark (1)**
16:13
**bank (3)**
25:19;36:13;43:10
**bankruptcy (12)**
18:25;49:10;58:13;
68:20;77:22,22;
78:10,17;79:11,18,19;
80:17
**based (1)**
28:9

**basically (1)**
4:14
**basis (9)**
15:5,13,15,17;
18:15;75:3;82:2;
84:13,21
**Bates (1)**
61:18
**BDO (14)**
12:21;13:6,13,14;
14:25;15:11;18:1,2;
44:17;51:24;52:2,17,
21,25
**bearing (1)**
52:14
**beat (1)**
46:6
**became (2)**
9:24;10:6,20;11:2
**Becky (1)**
18:10
**began (1)**
37:24
**begin (2)**
37:21;69:2
**beginning (1)**
57:20
**begins (1)**
78:5
**begun (4)**
37:15;38:6,14;
80:25
**behalf (1)**
25:12
**Belden (6)**
6:5;11:18,19;55:2;
61:19,24
**Belden's (1)**
62:3
**belief (1)**
79:9
**below (1)**
26:3
**benefited (1)**
60:23
**best (1)**
19:18
**better (1)**
56:19
**beyond (1)**
34:18
**big (3)**
10:21;46:5;48:7
**bill (12)**
14:2;16:9,11;18:17;
20:3,12,12;21:19,19;
31:5,13,20
**billing (1)**
19:23
**bills (6)**
20:7,20;21:3;26:7;
53:8;54:22
**bit (1)**

84:2
**blame (1)**
55:19
**blank (1)**
40:16
**Blue (2)**
43:7,7
**bookkeepers (1)**
18:5
**bookkeeping (2)**
18:21;36:17
**books (1)**
18:7
**BORIACK (21)**
4:1,6,10;7:9;9:13;
35:15;48:14;49:8,12,
16,21,24;50:2,7;
55:18;61:17;63:2;
79:13,21;83:14;85:5
**bottom (10)**
29:1,15;58:19;59:5,
16;68:14,19,19;78:4;
83:5
**bouncing (1)**
43:23
**box (3)**
50:9;60:2;61:1
**boxes (1)**
44:22
**brand (1)**
74:23
**Brandon (2)**
13:15;53:2
**break (2)**
55:7;64:9
**Briggs (7)**
9:3;62:20;63:7,8,
22;64:11,14
**broad (1)**
83:18
**brought (1)**
64:19
**budget (4)**
44:23;45:21;46:15,
18
**budgets (3)**
46:7,12;48:13
**build (1)**
33:9
**building (5)**
32:17,21;71:3,25;
74:11
**buildings (1)**
71:8
**built (1)**
30:17
**Business (9)**
35:18;36:2;39:5;
40:2;67:8,12;78:19;
79:1,17
**businessman (4)**
79:10;80:2,11,13
**busy (1)**

36:11
**butt (1)**
83:10
**buyer (3)**
81:7,7,9
**buyers (5)**
37:20;38:18,24;
81:13,13

## C

**calculated (2)**
27:4;76:23
**calculation (1)**
78:3
**call (1)**
52:19
**called (2)**
62:5;70:16
**calls (12)**
16:23;17:15;20:17;
22:12;35:1;41:11;
51:1;52:11;55:25;
62:10;71:9;82:24
**came (2)**
11:6;17:6
**Can (35)**
6:7;8:17;11:7,14,
24;17:12;21:11;22:4;
24:23;29:1;38:24;
48:2,24;51:4;55:8;
56:7;57:2;66:7,8;
67:4,10,11;71:1;
75:12,14,15,22;77:2;
79:13,21;80:2,22;
82:22;83:3,8
**capacity (1)**
4:20
**car (1)**
74:9
**Carbon (2)**
28:20;29:19
**cares (1)**
9:10
**carry (1)**
76:18
**case (10)**
14:20;46:13;48:13;
59:17,23;60:23;76:6;
79:2,3,19
**cash (13)**
11:8,10,13;31:10;
41:6,15,17,21;42:4,9;
83:15,20,23
**categories (3)**
8:12;27:25;30:16
**category (2)**
6:24;30:21
**caught (3)**
73:5;74:15,17
**Central (1)**
13:16
**certain (1)**

59:16
**certainly (1)**
48:18
**cetera (2)**
83:16,20
**change (2)**
57:7;58:4
**Chapter (13)**
12:24;35:18;36:12;
52:3;68:1;75:2,12,13;
76:20,23;77:18,19;
84:6
**charged (3)**
18:20;19:23;30:8
**check (2)**
70:14,15
**checked (4)**
44:24;45:6;50:10;
60:2
**checks (2)**
42:2,10
**circle (1)**
8:18
**City (5)**
19:24;24:9,12,15,
17
**claim (10)**
12:14,14;15:2,16;
16:18,22;17:12,13;
18:14;22:7
**claimants (1)**
82:22
**claims (5)**
12:7;16:18;82:14;
84:7,14
**Class (4)**
82:13,16,21,22
**clear (3)**
19:7;25:2;71:8
**close (1)**
72:19
**closed (3)**
14:10;38:7,15
**co-counsel (1)**
47:11
**Code (5)**
78:11,17,17;79:7;
80:17
**cold (15)**
68:15;69:13,14,15,
17,18,23;70:1,2,4,6;
71:6,11,11,24
**colloquy (1)**
42:6
**coming (6)**
11:11;69:12;70:1,2,
18,19
**comment (6)**
9:12;46:20;64:3,4,
25;65:7
**comments (2)**
73:8,22;74:1
**communicated (1)**

70:8
**company (2)**
46:3;50:17
**comparative (1)**
77:19
**compensation (1)**
59:22
**completed (3)**
12:25;13:11;38:6
**completely (1)**
79:8
**compound (1)**
64:8
**concern (2)**
71:12,16
**concluded (1)**
85:10
**conclusion (9)**
16:24;17:16;20:18;
22:12;51:2,6,16;
75:10;82:25
**conducting (1)**
48:2
**confirm (1)**
22:5
**confirmed (2)**
10:25;11:16
**connection (3)**
78:25;79:2,12
**connections (1)**
32:19
**conserve (1)**
11:7,13
**consider (1)**
6:23
**constitutes (1)**
77:3
**contact (2)**
13:15;24:17
**contacted (1)**
70:15
**continually (1)**
47:4
**continue (6)**
10:5;14:12;36:18;
39:5;47:17;48:24
**continuing (4)**
48:1;52:12;85:1,1
**contract (2)**
23:15,18
**contractor (1)**
50:25
**contractual (1)**
66:3
**copies (1)**
45:17
**copy (6)**
61:20;66:20;67:1,2,
3,17
**corporate (1)**
64:5
**correctly (1)**
22:1

**corrosive (3)**
70:3;71:15,17
**cost (5)**
10:2;27:8;28:10;
29:17;75:5
**costing (1)**
50:9
**costs (2)**
31:15;33:24
**counsel (6)**
41:1;75:4;76:22;
78:2;82:18;83:2
**County (3)**
24:3;54:15,16
**couple (5)**
18:18;19:2;37:23;
42:2;69:9
**course (3)**
19:20;38:11;48:4;
67:21
**court (1)**
46:11
**cover (2)**
32:3;61:25
**covers (1)**
57:19
**credit (4)**
20:3;21:17;31:13,
20
**creditor (2)**
59:21,24
**creditors (4)**
12:7;24:5;59:17;
60:6
**credits (1)**
26:14
**Cross (1)**
43:7
**current (1)**
84:17
**currently (2)**
4:10;12:23
**customers (1)**
50:18
**cut (3)**
39:11;42:2;75:12

**D**

**damper (1)**
72:7
**dance (1)**
83:8
**data (1)**
10:22
**date (6)**
17:7,18;26:19;
55:23;83:4,5
**dated (1)**
61:22
**day (4)**
38:1,17;53:4,23
**days (3)**

59:17,22;60:6
**day-to-day (1)**
36:17
**deal (4)**
36:14,14;48:7;63:6
**dealing (1)**
33:25
**deals (1)**
63:5
**debtor (10)**
4:24;5:22;12:7;
13:3;36:15;68:6;78:6,
9,20;79:19
**debtor's (1)**
78:14
**December (1)**
21:14;61:22
**decision (1)**
10:23
**deemed (1)**
51:19
**defer (15)**
33:5,18;41:1;42:22;
43:10;51:15;56:3;
65:6;75:4;76:22;78:2;
81:5,20;82:18;83:2
**defined (5)**
78:10,16;79:11,17;
80:16
**definitely (1)**
71:12
**definition (2)**
80:18;83:2
**Delaware (2)**
64:20,21
**deliver (1)**
31:15
**delivery (4)**
10:16,17;31:14,22
**dental (1)**
33:10
**Depending (1)**
72:9
**depends (2)**
72:23;84:15
**deposed (1)**
4:9
**deposit (2)**
57:12,13
**deposited (1)**
40:1
**deposition (4)**
5:8;9:1;48:2,23
**deposits (2)**
40:4,8
**described (1)**
81:21
**describes (1)**
66:3
**describing (1)**
64:5
**designation (2)**
82:17;83:1

**determined (1)**
17:19
**Deyoe (13)**
4:17;6:4;11:10;
33:5;43:2,3,21;51:10,
21;55:20;61:19;63:3,
4
**Deyoe's (3)**
11:4;25:16;33:10
**Dickman (13)**
30:6,7;42:2,20,21,
25;43:2,4,6;50:22;
51:8,16;58:9
**difference (1)**
18:1
**different (8)**
27:6;45:20;52:4,8,
14;62:15;73:10;79:8
**DIP (1)**
40:2
**direct (2)**
9:11;45:7
**directly (1)**
24:15
**disbursements (2)**
41:17,22
**discharge (1)**
83:6
**disclosure (1)**
52:13
**discuss (1)**
64:3
**discusses (1)**
65:20
**Discussion (2)**
55:5;68:5
**discussions (1)**
38:25
**disperse (1)**
46:4
**disposable (6)**
78:9,15,20;80:6,12,
14
**disposal (2)**
57:24;58:1
**dispute (6)**
20:8;22:10,20,22,
24;26:22
**disputed (2)**
22:7,10
**District (1)**
13:17;14:23;24:4
**document (16)**
5:20,21;7:3,4,5;8:8;
57:15;63:19;65:10,
24;66:18,22,23,24;
75:1;81:20
**documents (7)**
8:2,6,10,13,13;
14:18;44:23
**dollars (9)**
10:10;16:19,22;
17:12,14;32:1;75:3;

76:20;83:15
**done (16)**
11:8,9,22;12:21,22;
34:15,22;35:4;36:16,
17,23;47:25;49:7;
52:21;81:2;82:19
**door (1)**
31:10
**double-check (1)**
57:10
**doubt (1)**
76:14
**down (28)**
9:20;10:1,1,3,17,
19;14:11;22:13;
26:24;29:1;30:22;
33:2;48:22;49:4;
50:15,18;55:3;64:9;
69:3,6,12,22,23;70:1,
2,4;76:18;82:7
**due (1)**
17:19
**duly (1)**
4:2
**Dunn (6)**
16:14,21;54:12,22;
59:7;60:7
**during (3)**
10:7;31:17;36:2
**duty (1)**
52:12

**E**

**ear (3)**
45:12;47:5;48:25
**earlier (3)**
26:8,12;46:20
**early (1)**
81:11
**ears (1)**
48:1
**effective (2)**
83:4,5
**effectively (3)**
21:16;31:25;72:21
**effort (5)**
21:25;38:13;39:20,
21;40:22
**efforts (1)**
38:9
**either (5)**
11:17;36:19;37:2;
45:7;75:23
**elbow (2)**
55:15,17
**elected (1)**
66:13
**electric (3)**
20:12;21:3;26:7
**electricity (5)**
26:6;29:2,17;32:18;
54:5

**else (11)**
6:25;7:8,23,23;
11:7;35:9;39:18;
42:25;43:9;62:10;
65:1
**e-mail (1)**
61:19
**employed (2)**
4:10,20
**employee (3)**
50:24;59:22;70:17
**employees (3)**
10:18;50:20;51:11
**encompassed (2)**
30:1;32:14
**ended (1)**
9:3
**Energy (6)**
4:13;19:14,21,22;
64:21;72:24
**engaged (1)**
51:24
**engagement (2)**
84:15,16
**enough (1)**
72:19
**Entergy (1)**
29:18
**entire (1)**
36:2
**entities (3)**
24:4;65:8;77:8
**entitled (1)**
65:11
**entity (3)**
14:3,12;62:4
**entries (1)**
27:6
**entry (4)**
22:3;31:1,11,13
**equipment (13)**
37:18,19;69:24;
70:2,20,20;71:8,16,
20;81:8,13;83:16,20
**equivalent (1)**
4:18
**essentially (1)**
53:9
**estimate (5)**
13:2,10,12,24;28:3
**estimated (3)**
28:10;77:3;81:23
**et (2)**
83:16,20
**evaluate (2)**
71:18;85:4
**even (5)**
10:20;51:2;54:5;
56:19;77:16
**evidence (10)**
9:9;19:18;61:7;
64:2,17;65:4;66:16;
72:2;75:10;77:13

**exact (3)**
7:11,17;8:8
**exactly (11)**
16:9,12;19:2;31:12;
38:1,5,17;53:4,23;
54:20;77:23
**EXAMINATION (5)**
4:3;5:19,22;6:1;
85:10
**example (2)**
36:13;71:25
**Excellent (3)**
47:13,21;48:5
**excuse (5)**
21:3;22:6;36:4;
58:6;63:2
**exercise (2)**
18:19;75:22
**Exhibit (43)**
5:2,3,7,18,20;7:6,
22;11:20,21,23;12:2;
17:21;19:21;23:1;
24:19,20;35:12,14,14,
17;40:11;50:8;55:14,
17,21;56:23;57:16;
59:14;60:4,10;61:15,
16,17,18;62:17,18,19;
63:10;64:15;66:19;
67:23,24,25
**expect (4)**
14:21;23:20;84:5,
11
**expectation (2)**
14:19;34:20
**expecting (1)**
14:1
**expenditure (1)**
10:21
**expenditures (2)**
42:3,4
**expense (6)**
27:21;30:21;32:10,
14;59:21;77:7
**expenses (12)**
32:5,6,9;34:2;
43:19;58:9,20;62:1;
76:24;77:3,5,18
**expensive (4)**
10:3,6,9;11:2
**experienced (1)**
81:10
**explain (3)**
17:13;60:20;82:22
**extension (1)**
37:2
**extent (3)**
22:12;76:13,15
**eye (2)**
30:4;36:18

**F**

**fabrication (1)**

**50:17**
**faces (1)**
73:8
**facility (1)**
73:2
**fact (3)**
35:21;51:10;62:3
**facts (9)**
9:8;61:7;64:2,16;
65:3;66:15;72:2;75:9;
77:12
**failure (1)**
72:6
**falling (2)**
72:20,25
**falls (3)**
25:1;72:9,22
**familiar (1)**
52:23;68:11
**fan (2)**
69:11;70:5
**far (1)**
72:14
**February (2)**
20:6;21:9
**fee (10)**
18:22;32:24;37:5;
53:24;54:10,10;75:7,
13,13;76:23
**feeds (1)**
27:24
**fees (7)**
59:2;75:2;76:20;
84:6,9,11,13
**feet (3)**
56:10;72:3,20
**female (1)**
70:17
**few (3)**
35:25;49:10;57:16
**figure (7)**
18:15;26:10,19;
29:14;33:17;52:21;
77:20
**file (2)**
37:2,3
**filed (3)**
52:3;53:9;58:13
**filing (8)**
8:11;17:7,18;18:25;
55:22;59:17,23;60:23
**filings (4)**
22:20;36:22,24;
37:5
**finalized (1)**
84:8
**financial (8)**
6:21;9:2;10:22;
21:21;25:3;55:11;
62:20;66:19
**financially (1)**
10:4
**financials (12)**

**6:19;7:21;8:21,22,**
23;9:7,14,24;10:2,6,
13;11:2
**finding (2)**
37:20;81:13
**Fine (2)**
29:12;46:21
**finger (1)**
29:11
**finish (1)**
39:15
**fire (1)**
56:10
**firm (12)**
9:14;10:13,24;
16:15;18:2;25:11;
52:5,22;54:12,22;
59:7;75:8
**firms (2)**
9:6;59:11
**first (25)**
4:2;5:15;12:10;
25:5,6,18;28:21;
37:24,24;40:21,22,22;
41:3;55:10;56:1;58:3,
5,6,23;62:23;73:5,24;
74:5,7,10
**five (2)**
81:25;82:3
**five-minute (1)**
55:7
**Fixed (3)**
26:24;27:6,11
**flows (1)**
70:4
**focus (3)**
38:20;49:9,11
**folks (1)**
9:23
**follow (3)**
13:13;52:20;62:3
**follows (1)**
4:2
**foot (1)**
74:5
**forecast (2)**
44:24;45:22
**forecasts (2)**
34:15;48:13
**form (9)**
9:9;41:18;42:5;
43:12,23;64:7;67:20;
72:16;77:11
**forward (4)**
34:24;47:23;81:1;
84:25
**four (1)**
34:4
**Fourteen (2)**
6:10,11
**franchise (1)**
37:5
**front (4)**

**7:6,22;11:22;66:23**
**full (2)**
4:5;10:7
**fully (1)**
23:25
**fund (1)**
78:11
**fundamental (1)**
77:13
**funded (1)**
38:7
**further (3)**
41:4;60:18;65:9
**future (3)**
78:21;80:7;84:23

**G**

**general (13)**
7:1,21;21:21;27:19,
24;30:16,17;33:8;
56:4,24;57:19;65:7;
79:20
**generally (2)**
25:17;63:6
**generating (2)**
54:4;70:18
**generic (2)**
43:24
**gentleman (1)**
30:2
**gets (2)**
29:18;64:25
**given (1)**
12:24
**GLC (2)**
28:17;30:23
**goes (5)**
36:20;38:13;46:19;
52:22;72:23
**GOLDBERG (7)**
47:8,9,11,15,19,22;
48:24
**governmental (1)**
14:3
**governs (1)**
19:12
**Great (2)**
28:20;29:18
**grounds (1)**
16:5
**guess (7)**
4:19;12:24;17:1;
24:11;45:18;60:17;
69:7
**guest (1)**
76:16
**guy (1)**
47:4
**guys (1)**
13:5
**guys' (1)**
56:9

**H**

**hand (4)**
24:20;61:16;62:18;
67:24
**handed (2)**
61:17;67:25
**handing (2)**
35:13;56:24
**handle (1)**
25:17
**handles (1)**
33:6
**hang (1)**
57:4
**happen (2)**
14:16,21
**happened (2)**
14:14;24:14
**hard (10)**
73:4,6,23;74:4,7,10,
13,18,21;83:19
**Harris (1)**
54:16
**hat (2)**
73:4,6,23;74:4,7,10,
13,16,16,17,18,19,21
**hazard (1)**
72:12
**head (1)**
62:14
**heading (1)**
57:22
**heard (1)**
14:22
**hearsay (8)**
63:19,19,20;65:13,
18,23,24;66:6
**Heat (2)**
19:14,21
**heavy (2)**
72:7,9
**help (5)**
52:18,24;57:1,2;
75:15
**helps (1)**
30:2
**here's (1)**
21:7
**higher (1)**
29:11
**hired (1)**
44:9
**history (1)**
68:5
**hit (1)**
36:25
**Hold (2)**
52:10;56:9
**Holdings (8)**
61:12,13,25;62:5,7,
8,11,16

**holds (1)**
84:23
**home (4)**
32:9,21,23;43:19
**hope (1)**
46:8
**hour (1)**
55:4
**hourly (3)**
84:13,20,24
**hours (2)**
46:22;76:17
**housing (1)**
70:5
**housings (1)**
69:11
**huge (1)**
46:9

**I**

**idea (3)**
11:4;55:3;79:20
**identify (2)**
6:7;38:24
**ignore (1)**
47:16
**impact (1)**
72:19
**impaired (2)**
82:21,23
**implementing (1)**
11:11
**important (1)**
49:11
**improperly (1)**
65:4
**improvements (1)**
27:2
**inappropriate (1)**
48:23
**Inc (1)**
62:16
**include (3)**
77:10;84:25;85:1
**included (6)**
27:17;28:5;33:15,
16;61:4;63:7
**includes (1)**
58:15
**Including (6)**
58:12,23;59:21;
60:6;63:8,9
**income (12)**
14:13;28:17;34:11,
16;51:21;55:22;
78:10,15,20;80:6,13,
14
**inconsequential (1)**
15:24
**incorrect (2)**
63:24;65:2
**independent (1)**

50:25
**indicating (2)**
7:4;66:24
**individual (1)**
20:23
**individuals (1)**
77:8
**inflow (1)**
58:3
**information (9)**
6:16,18;8:11;37:4;
52:8;75:24;76:3,7;
77:16
**initially (1)**
73:5
**insider (2)**
60:24;61:7
**instead (1)**
26:20
**instructing (3)**
49:1,3,17
**instructions (1)**
62:4
**insurance (6)**
33:3,6,12;43:1;
56:11;57:9
**insurances (1)**
33:11
**Integral (29)**
4:11,15,18;17:11;
25:14,15;28:8;32:5,
24;35:24;43:11,15;
44:4;51:11;53:12,16;
58:20;59:2;60:6;61:4,
9,11;65:21;66:3,14,
21,21;77:10;85:2
**interacting (1)**
25:13
**interested (5)**
56:9;75:23,25;76:2,
4
**interior (1)**
70:4
**Internal (1)**
12:10
**Internet (1)**
32:18
**interrupt (1)**
14:6
**interrupted (1)**
47:24
**interrupting (2)**
47:20,25
**intimidate (3)**
48:10;49:4,19
**intimidating (4)**
48:14,22;49:5;50:3
**into (14)**
4:24;27:6,24;36:15;
38:13;40:2;41:4;
69:22,23;70:1,5,20;
71:15;74:10
**investment (1)**

27:5
**invoice (8)**
15:10;16:2,7;17:2,
4;32:2;33:7;54:20
**invoiced (3)**
26:13,16;31:22
**invoices (5)**
17:4;20:21,24;33:7;
54:12
**involve (1)**
84:7
**IRS (2)**
24:3;51:2
**issue (1)**
31:18
**issued (2)**
31:14;41:3
**item (6)**
16:14;28:5;29:2;
33:22,23;50:7
**items (5)**
8:4,4,6;27:9,12

**J**

**JACOBS (101)**
4:4;5:3,14,18;6:12;
8:12,20;9:13;15:17,
22;16:2,25;17:21;
19:25;20:22;22:15,
25;24:20;29:10;35:3,
13;41:13,20,21,25;
42:4,13,19;43:15,25;
44:4;45:9,14;46:24;
47:2;48:3,5,14,19;
49:1,8,12,15,16,21;
50:2,7;51:7,20;52:25;
54:11;55:4,6,10;
56:11,17,20,24;61:9,
16;62:12;63:21;64:4,
9,23;65:9,15,20;66:2,
11,18;67:16,18,24;
71:22;72:4,18;73:12,
15,20,23;74:4,12,19,
25;75:17,25;76:4,7,
19;77:25;79:4,13,21;
80:6,19;83:3,9,12,13;
85:5
**January (20)**
9:22;20:3;21:2,8,
14,15,17,19;31:3,4,9,
14,18,20;55:22;
56:25;57:6,12,19,21
**Jefferson (2)**
13:16;24:3
**job (2)**
50:8;67:10
**John (2)**
11:17;61:20
**joint (1)**
4:19
**judge (3)**
47:20;50:6;77:22

**jump (1)**
56:8
**June (7)**
9:21;22:14;37:1;
44:7;53:5,6;69:5

**K**

**Kansas (1)**
19:23
**keep (15)**
8:18;34:9;36:18;
46:5,17;48:2,3,12;
66:19;67:2,3,10,12,
12,17
**keeps (2)**
30:4;45:12
**kicked (1)**
12:25
**kind (8)**
20:4;21:21;39:22;
46:15;51:19;52:12;
74:19,23
**knew (1)**
74:17
**Knock (3)**
47:18;76:16;77:24
**knowledge (3)**
35:5;69:1;79:1
**knows (4)**
51:2;72:10;83:9,9

**L**

**laboratory (1)**
70:22
**Lakes (2)**
28:20;29:18
**land (2)**
19:11;23:23
**large (1)**
72:7
**last (16)**
9:2,10;10:18;12:22;
13:6,25;19:25;28:20,
23;52:17;55:11;
62:19;73:1;74:5;78:8;
80:11
**law (5)**
16:14;54:12,22;
59:7;75:7
**lawyer (4)**
47:12;73:13;76:16;
84:14
**lawyers (2)**
77:22;84:4
**layoff (1)**
9:22
**leak (4)**
68:15;69:2,8,8
**leaking (1)**
69:11
**leaks (2)**

69:22,23
**lean (1)**
13:4
**learning (1)**
52:2
**lease (13)**
19:4,7,9,15;20:1,
21;21:4,9;22:19;
23:13,21;26:22;31:19
**leave (2)**
46:25;47:2
**lecturing (2)**
73:16,17
**ledger (22)**
21:22;27:18,19,23,
24;30:11,16,17,20;
33:8,8,18,19;42:23;
56:3,4,18,18,21,25;
57:19;58:16
**ledgers (2)**
7:1,22
**left (2)**
26:1;40:16
**legal (35)**
16:24;17:16;20:18;
22:12,20;24:1;33:21,
23,24;34:2;39:20,21,
23;51:2,6,16,18,19;
59:4;75:10;77:21;
78:3,18;79:6;80:16,
18;82:17,25;83:1;
84:6,9,11,12,14,15
**less (1)**
59:24
**lesser (1)**
18:16
**letting (1)**
47:22
**liability (2)**
13:3;27:22
**light (1)**
30:4
**limited (2)**
63:16;64:21
**line (7)**
23:21;27:12;28:5,
17;29:1;33:23;50:7
**lines (1)**
18:23
**liquid (4)**
69:11,12,22;71:15
**liquidating (4)**
46:3,13,14;48:13
**liquidation (8)**
77:9,19;80:15,19,
20;81:1,4;82:6
**list (4)**
8:4,7;39:2;59:20
**listed (17)**
12:10;16:6,17,18,
21;17:11,13;18:14;
22:7;24:3;25:19;
27:12;60:14;61:9,11,

12;82:22
**listing (5)**
7:11,18;19:4;27:1;
50:20
**lists (3)**
13:16;17:22,22
**literally (2)**
15:20,21
**litigation (2)**
34:3;73:11
**little (6)**
29:24;30:13;58:9,
20;59:4;84:2
**lives (1)**
4:25
**locate (1)**
22:4
**long (6)**
18:7,8;55:2;72:23;
74:12;82:7
**longer (1)**
54:5
**look (13)**
5:3;14:18;30:11;
32:4;33:19;34:11;
41:4;54:20;55:7;
60:16,17;75:14,22
**looked (10)**
7:12,14,15,19,19;
8:5,9,25;21:24;39:23
**looking (10)**
8:14;11:12;25:18;
38:11;49:12,20,22,24;
68:14;77:17
**looks (3)**
57:4,5;71:14
**Loss (1)**
28:14
**lot (2)**
72:24;74:9
**LP (2)**
63:16;64:21

**M**

**maintaining (1)**
36:20
**maintenance (2)**
29:22;30:5
**majority (1)**
9:23
**makes (1)**
30:3
**making (2)**
26:11,15
**manage (1)**
4:13
**management (3)**
4:12;54:10;66:4
**manager (1)**
11:13
**manager's (1)**
25:22

**managing (1)**
4:15
**many (3)**
8:17;12:22;18:24
**March (3)**
20:6;21:9;57:13
**Marked (10)**
5:2;11:20;24:19;
34:1,2;35:12;56:23;
61:15;62:17;67:23
**mass (1)**
9:22;72:7
**material (5)**
70:3,18,19,21;81:8
**materials (1)**
81:12
**math (1)**
75:14
**matter (6)**
8:3;22:19;24:1;
34:2;67:20;81:11
**matters (2)**
33:25;36:11
**maximum (1)**
82:5
**may (16)**
16:25;17:2;39:20;
41:14,22,23;42:14;
43:8,16,19,24;44:5,
10;48:3;53:5;75:6
**maybe (7)**
13:8;18:8,18,18;
19:2;46:16;73:10
**McMahan (11)**
17:22,22,25,25;
18:4,5,13,13;25:10;
44:17,19
**mean (34)**
10:15;11:18;14:6,7;
15:24;17:2;18:17,24;
22:19;27:19;31:6,12,
24;33:22;38:5;39:11,
21;45:5,13;46:2,4,5;
51:15,16;56:17;
57:11;61:11;64:20,
25;72:6,10;80:1,12,14
**meaning (1)**
37:11
**medical (4)**
33:10,12,12;43:1
**meeting (1)**
83:25
**memory (1)**
7:13
**mentioned (2)**
8:21;70:11
**Michael (1)**
47:8
**mid (1)**
58:16
**might (7)**
52:22;55:2;64:19;
74:24;79:9;80:1,1

**million (5)**
34:21,24;75:3;
76:20;83:16
**misspeak (1)**
33:20
**Monday (1)**
73:3
**money (5)**
20:16;31:15,15;
58:3;81:3
**monitoring (1)**
36:21
**Montgomery (1)**
54:15
**month (12)**
21:8;31:17;39:6,9;
41:7;44:5,7;53:14;
54:1,2;69:4;82:9
**monthly (7)**
18:5,17,21;19:15;
35:17;53:17;54:9
**months (9)**
18:24;21:12,13;
37:23;58:6;69:9;
81:23;82:8,11
**month-to-month (1)**
44:18
**more (5)**
8:17;10:20;39:16;
60:5;76:18
**most (2)**
38:20;59:7
**Move (4)**
4:23;29:10;48:24;
83:12
**Moving (2)**
30:22;81:1
**much (4)**
4:25;39:13;42:21;
81:3
**myself (1)**
73:5;74:17

**N**

**N/A (1)**
40:3
**name (2)**
4:5;47:8
**naming (1)**
8:7
**Nate (6)**
11:17,18,18,19;
61:19;65:6
**Nathan (7)**
30:7;36:20;42:1,2,
20;70:11,15
**Neal (6)**
16:14,21;54:12,22;
59:7;60:7
**necessary (2)**
32:12;41:2
**need (10)**

42:12;47:7,48:9;
52:19;61:24;73:8,21,
25;77:16;82:8
**negative (3)**
34:12,21,23
**neighborhood (1)**
16:10
**net (3)**
34:9,11,16
**next (27)**
14:24;16:14;17:11;
19:3;27:14;28:13;
29:21;32:5;34:12;
35:13;39:4,6,9;40:24;
41:7;44:22;50:19;
51:23;58:8;59:1;
60:21,21;68:4;74:25;
75:1;78:4;81:22
**Nobody (1)**
9:10
**none (5)**
45:1;50:12;60:2,9;
61:1
**nonpriority (1)**
82:13
**nonproperty (1)**
33:3
**nonresponsive (1)**
42:16
**normally (1)**
74:9
**Norton (1)**
59:10
**Note (4)**
65:10,16;66:1,2
**notes (1)**
45:13;47:5;55:7
**notice (5)**
5:7,13,19,21;69:8
**noticed (1)**
74:15
**number (9)**
7:19;8:9;28:3,5,9;
60:6;61:18;75:5;82:8
**numbering (1)**
55:18
**numbers (1)**
29:8

**O**

**object (15)**
22:11;41:11,18;
42:5;45:4,24;51:13;
52:11;61:6;62:9;
63:18;65:13;66:5;
73:7;77:11
**Objection (35)**
7:25;8:15;9:8;
15:14,19;16:23;
17:15;19:17;20:17;
22:17;35:1;42:16;
43:12,22;51:1;54:7;

64:1,7,16;65:3,18,23;
66:15;67:19;71:9;
72:1,16;74:6,14,20,
22;75:9;78:22;80:8;
82:24
**obligation (1)**
28:2
**obligations (1)**
83:25
**observed (1)**
69:10
**obviously (4)**
12:13;68:12;78:18;
81:9
**occur (1)**
80:23
**occurred (1)**
38:5
**occurs (1)**
81:10
**off (6)**
12:25;30:17;39:12;
55:5,9;56:1;62:14;
70:3
**offered (1)**
81:9
**office (11)**
27:11;32:6,9,10,14,
16,20;37:4;43:19;
58:20;71:25
**offices (2)**
32:12,23
**offset (5)**
20:4,25;21:3,20;
31:4
**offsets (1)**
26:11
**once (1)**
54:5
**one (22)**
6:9;8:20;12:10;
13:25;14:2;17:10;
24:22;26:2;33:5;
36:25;37:16;50:22;
53:12;54:15,15;57:8,
8;60:22;62:19;63:4;
81:6;82:8
**ones (1)**
8:10
**ongoing (3)**
34:3;36:21;39:16
**only (3)**
25:25;26:2;76:17
**onsite (2)**
37:8,12
**Open (1)**
79:7
**operate (3)**
20:19;36:2;39:5
**operating (10)**
34:9;35:17;38:8;
46:7,8;50:15;52:15;
53:19;54:4,9

**operation (2)**
10:8;26:1
**operations (1)**
36:9
**original (1)**
27:8
**others (1)**
60:7
**otherwise (1)**
14:22
**ought (2)**
46:16;73:10
**out (21)**
19:20;21:17;30:3;
31:10,20;32:23;
36:19,20;47:18;48:7;
52:18,21,24;55:14;
57:2;69:11;74:9;
76:17;77:20,24;81:13
**out-of-pocket (1)**
31:15
**outside (7)**
8:22,24;9:6,14;
10:13,23;18:21
**over (16)**
7:19;8:5,9,25;
11:12;12:22;29:24;
30:13;34:6;58:9,21;
59:5;63:3;64:12,13;
76:10
**owe (2)**
20:15;24:4
**owes (1)**
21:5
**own (1)**
62:12
**owners (2)**
4:19,19
**ownership (1)**
63:13
**Ox- (1)**
21:2
**Oxbow (43)**
9:20;10:17;19:4,16,
23;20:1,5,12,15,20;
21:5,10,13;22:13;
24:10,12;26:7,13,17;
28:24;29:19;31:9,14,
17,21;33:21,23,25;
34:1,2,2,4;39:23;
59:4;69:12;70:6,7,11,
14,16,16,19,20

**P**

**P&L (1)**
21:21
**page (52)**
5:4,15,17,25;12:5;
14:24;17:21;19:3;
22:25;23:1;25:5;
27:14;28:13;29:4,5,
11,21;34:12;40:9,10,

11;44:22;50:8,19;
51:23;53:7;54:25;
55:18,21;57:17,23;
58:8,19;59:1,14;
60:10,21,21;62:23;
63:12;64:15;65:10;
68:4,7,17,18,21;
74:25;75:1;82:12,19;
83:3
**pages (2)**
12:2;25:6
**paid (17)**
15:8;18:25;20:23,
24;24:9;31:8;33:11,
13,14;43:11,15,18;
44:4,10,13;53:17;
54:23
**paper (1)**
15:15
**paragraph (11)**
64:5,10,15;65:1,20;
68:14,18,19,22,24;
78:5
**parking (1)**
74:9
**part (7)**
55:19;59:15;60:10;
66:20;67:6,8;84:16
**partial (2)**
37:15,17
**particulars (2)**
17:10;23:25
**partner (4)**
4:11,15,17;65:7
**Partnership (1)**
64:22
**part-timers (1)**
10:18
**party (4)**
35:23,24;65:11,16
**PASE (93)**
5:22;12:7,17;13:3,
23;19:10,11,16;20:1,
7,11,15,25;21:2,3,5,9,
13,22;22:6,15;24:4,8,
15;25:3,12;26:1;
28:14;29:18;31:9;
32:8,12,12;33:11,13,
14;34:4,9,11;35:18;
36:9;37:21;41:15,17,
22;42:14;43:8,16,18;
44:5,10,10;50:25,25;
51:7,11,20,24;52:2,4;
53:9;55:11;58:3;
61:12,13,25,25;62:4,
5,7,8,11,13,20;63:14,
16;64:5;65:21;66:4,
14;68:1;69:11,23;
70:2,7;71:3,7,15;74:5,
8;80:7,22;81:3
**PASE2042 (1)**
61:18
**PASE's (13)**

6:21;9:7,13;12:20;
13:20;25:6,13;34:16;
71:25;73:1;78:20;
80:20;84:17
**pass (2)**
47:5;85:7
**passing (1)**
45:12
**past (3)**
20:11;24:9;73:3
**PATTERSON (101)**
4:22;5:11,16;6:10;
7:25;8:15;9:8;15:14,
19,23;16:23;17:15;
19:17;20:17;22:11,
17;29:8;35:1;41:11,
18,24;42:5,16;43:12,
22;44:1;45:4,11,23;
46:1;47:1,3,10,13,18,
21,24;48:4,6,17,20;
49:3,9,14,17,22,25;
50:4;51:1,13;52:10;
54:7;55:1;56:6,13,19,
22;59:11;61:6;62:9;
63:18;64:1,7,16;65:3,
13,18,23;66:5,9,15;
67:11,19;71:9;72:1,
16;73:7,13,17,21,25;
74:6,14,20,22;75:7,9,
21;76:1,6,11;77:11;
78:22;79:6,15,24;
80:8;82:24;83:7,10;
85:8
**pay (10)**
20:6,25;31:21;
44:15;51:7,20;84:3,
12,19;85:1
**payable (1)**
27:15
**payment (13)**
19:15;20:1,2;21:9,
15,16,18;30:23;31:2,
3,9,19,19
**payments (23)**
20:7;21:4,13;22:16,
19;26:11,15,18,22;
42:1,13;43:7;58:12,
15,23;59:16,20;60:5,
9,22;78:11;81:16,18
**payroll (2)**
9:25;10:19,19
**pays (1)**
24:8
**people's (1)**
48:1
**Per (2)**
54:1,2
**percent (2)**
19:22;62:12
**percentages (1)**
62:15
**performance (1)**
77:6

**performing (1)**
83:24
**perhaps (2)**
52:21,22
**period (5)**
32:2;36:3,3;40:6;
43:14
**periodic (1)**
37:3
**periods (1)**
43:23
**person (3)**
70:11,16;78:19
**personal (1)**
4:24
**phones (1)**
32:19
**photographs (1)**
69:19
**phrase (1)**
79:1
**piece (1)**
81:8
**pin (1)**
55:3
**plan (21)**
37:7,11;39:5;46:10;
68:1;78:11;79:3,5,18,
19;81:16,19,22;82:3;
83:14,19,24;84:1,12,
12,25
**planned (1)**
39:8
**plant (19)**
4:13;9:20;11:13;
18:10;27:1,5;28:10;
30:3,4,4,13;36:19,20,
23;53:19;54:3;69:3,6;
72:15
**please (6)**
4:5;5:4;44:1;69:4;
73:12;79:14
**plus (1)**
15:15
**pm (3)**
55:9,9;85:10
**point (3)**
10:3;53:23;75:21
**Pollard (2)**
13:15;53:2
**Port (10)**
4:12,13;13:20;
24:10,17;37:9,12;
64:20;71:4,5
**position (1)**
71:7
**positioned (1)**
22:23
**positions (1)**
4:18
**possession (1)**
36:15
**possible (1)**

82:6
**possibly (1)**
73:15
**potential (4)**
24:5;38:18,24;75:5
**Power (45)**
4:11,16,18;10:16,
17;17:11;20:3,6,20;
21:18,19;25:14,15;
28:8,17,20,23,24;
31:4,13,14,16,17,20,
22;32:5,24;35:24;
43:11,15;44:4;51:11;
53:12,16;58:20;59:2;
60:7;61:4,11;65:21;
66:4,14,21;77:10;
85:2
**practical (1)**
10:5
**predictive (1)**
29:22
**preparation (2)**
7:24;15:6
**prepare (2)**
6:14;52:5
**prepared (10)**
8:22,24;12:17;25:9,
10;28:4,9;45:22;
63:22;68:10
**preparing (3)**
12:20;28:7;56:15
**preserve (1)**
11:9
**pretty (4)**
39:13;56:7;76:2;
83:11
**preventing (1)**
71:24
**Previously (3)**
5:2;11:20;62:17
**prior (4)**
18:25;37:25;65:5;
72:5
**priority (1)**
12:14
**Probably (2)**
7:10;13:8
**problem (2)**
67:15,16
**proceeding (1)**
84:7
**proceeds (2)**
46:4;56:16
**process (4)**
36:12;37:18,21;
38:12
**produced (4)**
6:20;8:11,23;14:18
**production (1)**
9:3
**professional (1)**
30:12
**professionals (2)**

44:9,20
**Profit (1)**
28:14
**progress (3)**
50:9,16,18
**project (2)**
50:8;81:3
**projected (5)**
41:6;78:9,14,20;
81:5
**projecting (2)**
80:7,22
**projection (5)**
34:22;35:4;44:23;
45:21;46:18
**projections (7)**
34:15;40:13,20,24;
46:6,12;48:8
**property (8)**
13:17,20,24;19:10;
59:24;60:22;74:5,8
**provide (2)**
17:25;64:24
**provided (4)**
18:1;41:14;45:6;
67:21
**pursuing (1)**
84:14
**put (10)**
11:24;24:23;27:6;
38:22;44:1;59:13;
73:6;74:18;75:18;
82:7

## Q

**quarter (1)**
28:21
**quarters (2)**
58:4,5
**questionnaire (1)**
36:1
**QuickBooks (1)**
18:6
**quite (5)**
17:9;17;23:24;
62:15;68:12

## R

**Railroad (1)**
19:24
**rain (4)**
69:22,25;70:1,2
**rains (1)**
71:1
**raised (1)**
31:18
**rather (2)**
51:5;56:20
**Ray (1)**
36:19
**read (2)**

64:12;79:7
**reading (4)**
63:19;64:13;77:14,
20
**ready (1)**
35:15
**real (2)**
31:15,25
**really (9)**
10:5,5;15:24;41:2;
46:2;56:6,8;75:19,23
**rearrangement (1)**
24:11
**reason (3)**
16:6;45:21;80:1
**Rebecca (1)**
18:12
**recall (9)**
7:18,23,23;14:15;
17:5;20:2;21:11,25;
53:6
**receipts (3)**
40:2;41:6,15
**receivable (1)**
26:3
**receive (3)**
51:21;67:1;81:4
**received (5)**
13:23,25;17:2;
31:17;53:9
**receives (2)**
77:7,25
**recently (2)**
9:1;21:24
**recollection (1)**
56:15
**record (6)**
47:6,14;55:5,9;
65:25;67:12
**recover (1)**
32:11
**reduced (1)**
10:20
**refer (8)**
22:21;27:18,23;
30:15,20;42:22;
56:18,20
**reference (18)**
14:25;23:2,12;
29:21;30:22;32:24;
33:2;55:22;57:23;
58:8;67:4,7;68:15;
69:7;78:18;80:16;
82:12;83:4
**referenced (6)**
23:18;26:7,12;58:2;
80:19;82:21
**references (2)**
50:8;54:11
**referencing (1)**
34:3
**referring (8)**
7:5;39:22;44:16,17;

52:4;57:6,62:8;80:20
**refers (2)**
62:7;81:15
**reflect (3)**
26:10,14;29:17
**reflected (6)**
21:20;22:1;58:16;
60:9;63:9;64:25
**refund (3)**
56:12;57:5,6
**refunds (2)**
57:13;58:2
**refused (1)**
20:6
**regular (3)**
30:3;44:18;59:22
**reimbursed (2)**
32:8,15
**reimbursements (1)**
59:21
**relate (1)**
8:6
**related (4)**
6:16;8:3;65:11,16
**relates (2)**
54:15,16
**relation (2)**
79:3,18
**relationship (1)**
66:3
**relative (2)**
10:7,21
**relevance (8)**
9:10;16:24;67:19;
74:6,14,20,22;78:22
**relevant (1)**
48:21
**remaining (1)**
81:1
**remember (1)**
8:13
**removal (4)**
28:10,12;71:13,25
**remove (2)**
71:7,20
**removed (1)**
71:6
**rent (1)**
21:18
**Repeat (1)**
28:22
**rephrase (1)**
41:13
**Report (10)**
35:17;37:3;38:8;
40:22,22,25;41:3,14;
52:15;64:11
**REPORTER (2)**
74:2;76:9
**reporting (2)**
36:3,3
**reports (4)**
37:5;44:24;45:22;

50:9
**required (5)**
11:1;39:19;78:11;
81:16,19
**reserve (1)**
85:8
**reside (1)**
19:11
**residence (1)**
32:22
**respond (1)**
13:5
**response (3)**
48:16;51:19;67:9
**responsibilities (1)**
66:20
**responsibility (1)**
25:16
**responsible (3)**
25:12;35:23,24
**restate (1)**
58:14
**resulted (1)**
68:20
**retirement (1)**
28:1
**return (13)**
12:18,20,21;13:7,
10;15:7;39:15;51:24;
52:3,5,18,24;67:22
**revelation (1)**
46:11
**revenue (7)**
9:21,25;12:11;
14:12;20:20;54:4,6
**review (6)**
6:18,25;7:8;8:21;
63:21;64:10
**reviewed (3)**
6:16;8:2,25
**reviewing (2)**
7:24;12:23
**ridiculous (2)**
16:1;48:11
**right (89)**
6:5,13;7:3;10:15;
11:12,22,22;12:3;
15:15;17:23;19:3,13,
14;20:12,13;22:4;
23:5,16;24:5;25:1,20;
26:8,9;27:13;29:9,15,
20;30:21,21;32:25;
33:21,22;34:7,13;
35:23;36:7;37:1;38:4;
40:7,12,20;42:24;
45:1,2;46:22;47:12;
49:13,24;50:3,6;
53:14,17,19;54:6;
55:15,17;56:5,16;
57:20,24;58:13,17,21,
24;59:2,5,8,11;60:2;
61:22;63:7,10,16;
64:17;66:4,23,24;

69:1;71:25;73:9,18;
75:14,21;76:21;
77:20;79:4;80:4;
81:25;83:21
**ring (3)**
72:7,8,10
**role (1)**
73:11
**roll (1)**
72:23
**roof (1)**
32:18
**Rose (1)**
59:10
**Rule (1)**
5:22
**run (2)**
18:5,7
**Ryan (2)**
11:17;61:20

## S

**safe (1)**
72:13
**safely (1)**
81:2
**safety (2)**
71:12;72:12
**sale (11)**
28:20,23;37:16,17;
38:6,12,15;39:2,10;
56:13,16
**sales (2)**
28:17;56:16
**salvage (1)**
28:11
**same (10)**
6:23;10:14;20:15;
21:12;27:11;29:5;
44:7;53:16;68:18,20
**sample (3)**
70:24,25;71:2
**Sanders (2)**
18:10,12
**saw (4)**
9:2,11,12;60:4
**saying (1)**
5:10
**Schedules (2)**
12:6;46:10
**second (6)**
68:14,18;71:23;
78:8;80:23;81:15
**Secretary (1)**
37:3
**Section (6)**
40:13,16;65:16;
78:4,10;82:14
**Security (2)**
51:7,20
**seems (1)**
82:17

**self-employment (1)**
4:14
**sell (5)**
37:7,11;38:9,21;
83:20
**selling (1)**
37:22
**send (3)**
20:12,20,21
**sent (2)**
5:12;14:9
**sentence (2)**
78:8;81:15
**serious (1)**
46:1
**service (2)**
10:19;12:11
**services (6)**
15:16;17:23,25;
30:9,12;66:4
**set (2)**
74:5;76:11
**settled (1)**
84:8
**seven (2)**
46:22;76:17
**sheet (4)**
7:21;25:5,6,9
**sheets (1)**
6:21
**Shield (1)**
43:7
**shirt (1)**
74:23
**shoes (2)**
24:14;74:24
**showed (1)**
21:23
**shown (1)**
38:8
**shut (9)**
9:20;10:17,19;
14:11;22:13;50:15,
18;69:3,6
**shutdown (1)**
9:21
**signed (1)**
35:21
**silly (1)**
46:23
**similar (1)**
34:20
**simple (7)**
9:24;10:1,7;11:3;
21:8;73:16;83:11
**simply (1)**
47:16
**sit (1)**
12:17
**site (2)**
71:8,14
**six (1)**
51:14

**size (1)**
10:21
**Small (1)**
35:18
**snapshot (1)**
52:13
**Social (2)**
51:7,20
**sold (2)**
29:18;56:14
**somebody (2)**
62:10;68:12
**somehow (1)**
84:9
**somewhat (1)**
24:14
**somewhere (2)**
16:13;21:20
**sorry (10)**
28:22;29:7,12;
31:24;39:11;40:5;
58:14;67:6;74:3;77:1
**sort (1)**
27:8
**sought (1)**
66:13
**sounds (2)**
24:1;78:3
**source (2)**
55:25;58:2
**Southern (1)**
19:24
**space (1)**
32:16
**specific (3)**
42:12;43:14,24
**specifically (1)**
68:11
**specified (1)**
19:16
**speculation (8)**
35:2;41:12;52:12;
62:10;64:1;71:10,10;
72:11
**spelled (1)**
19:20
**stack (5)**
69:14;70:4;72:5,8,
20
**stacks (15)**
68:15;69:13,15,17,
18,23;70:1,3,6;71:6,
11,13,24;72:3,18
**standpoint (2)**
50:16,24
**stare (1)**
48:22
**staring (1)**
49:4
**start (4)**
5:14;37:21;38:16;
63:3
**state (2)**

36:25;37:5
**stated (1)**
51:15
**statement (8)**
15:11;21:21;23:15;
25:2;39:22;43:10;
62:20;78:5
**statements (4)**
6:21;9:2;55:11;
66:19
**states (1)**
51:23
**State's (1)**
37:4
**status (1)**
12:24
**statute (1)**
75:14
**statutory (2)**
75:13;76:11
**stay (2)**
82:19,20
**Steam (4)**
4:12;9:25;54:4;
64:21
**steel (1)**
72:9
**step (1)**
71:22
**stepped (3)**
24:12,14;74:8
**stepping (1)**
74:8
**stick (1)**
4:23
**still (2)**
43:24;52:19
**stopped (1)**
52:3
**storage (3)**
37:8,8,12
**stream (1)**
9:21
**streamline (1)**
55:8
**strictly (1)**
26:16
**strokes (1)**
83:18
**structure (3)**
63:14;64:6;65:7
**structures (1)**
27:1
**struggling (1)**
75:19
**stuff (3)**
55:20;56:14;71:17
**styled (1)**
22:23
**Subchapter (1)**
68:1
**sublease (14)**
20:16;21:13;22:15;

23:2,22,23;26:11,15,
18;30:23;31:2,19,23;
32:2
**submitted (1)**
17:5
**subsequent (1)**
20:5
**subtract (1)**
26:18
**sufficient (1)**
78:9
**suggesting (2)**
45:5;46:17
**summary (1)**
63:13
**Sunday (1)**
73:3
**support (1)**
39:19
**suppose (2)**
18:22;84:9
**Sure (33)**
7:16;17:9,17;19:2;
20:9;23:4,25;24:13;
28:23;30:11,20;31:7;
33:19;38:4;41:20;
42:23;53:4,24;56:7;
57:3,5;58:15;62:15;
65:15;66:23;68:12;
70:13;72:11,12;
74:15;76:2;77:2;80:3
**surprise (2)**
46:5,9
**surprised (1)**
73:10
**sworn (1)**
4:2;75:17

## T

**table (1)**
49:5
**talk (10)**
12:6;38:18;42:11;
46:17;47:6,12,13;
48:9;52:25;53:3
**talked (4)**
13:6;14:23;46:10;
52:17
**talking (7)**
19:8;41:19;42:3;
48:12;65:24;76:10;
79:16
**talks (1)**
40:13
**tall (2)**
72:3,20
**tax (19)**
12:18,20,21;13:3,5,
5,7,10,17;14:2,12,18;
15:6;18:2,4;39:15;
51:24;52:5;67:22
**taxes (10)**

12:13;13:24;24:3,5,
8,9,16,17;51:8,21
**taxing (3)**
24:7,11,11
**team (1)**
68:13
**technical (1)**
50:24
**TED (2)**
4:1,6
**telling (3)**
47:15;49:6;79:16
**term (7)**
79:6,9,11,17,18,25;
80:12;81:22;82:2
**terminate (1)**
66:13
**terms (1)**
31:9
**testified (1)**
4:2
**testify (1)**
6:15
**testimony (10)**
7:24;20:10,11;
56:21;57:3;65:5;73:9;
75:18;76:5,21
**testing (1)**
30:9
**Texas (1)**
13:21
**thinking (2)**
62:10;84:18
**Thirteen (1)**
5:6
**though (1)**
60:4
**thought (1)**
57:8
**thousand (2)**
10:10;83:15
**Three (6)**
41:25;55:16;58:3,5,
6;76:18
**times (2)**
8:17;51:14
**timing (1)**
17:3
**today (10)**
4:8;20:6;2:15;7:24;
9:1;12:17;49:10;
52:14;84:22
**today's (3)**
5:7,19,22
**together (1)**
38:22
**told (5)**
4:22;5:12,16;63:25;
76:1
**tomorrow (1)**
71:6
**took (2)**
57:12,12

**top (21)**
5:9;12:1,3;23:9;
28:17;29:7,8,9,9,9,9,
9,11;40:10;55:18;
62:14;63:13,13;
64:15;72:8,22
**topic (3)**
6:17;25:2;75:18
**topics (6)**
6:1,4,5,5,7,14
**total (4)**
7:18;9:21;12:14;
41:6
**totaled (1)**
27:7
**totally (1)**
46:21
**transaction (3)**
37:24,25;81:10
**Transactions (2)**
65:11,17
**transfer (3)**
31:25;61:25;62:4
**transferred (1)**
59:24
**transfers (3)**
59:16,20;60:22
**transformer (2)**
23:13,21
**travel (1)**
32:6
**treatment (2)**
72:15;82:13
**trucks (1)**
83:19
**True (4)**
20:16;27:11;41:10;
54:5
**trustee (1)**
75:13
**try (11)**
21:25;45:20;48:10;
49:4,9;51:18;55:2;
67:11;72:14;77:20,21
**trying (15)**
38:22;46:5;48:6,7,
18,21;49:19;52:18,
20;56:9;67:14;75:15,
17;77:14;83:10
**turn (3)**
5:4,12;14:24
**twice (2)**
15:20;80:9
**two (7)**
10:18;13:9;24:4;
25:6;37:8;41:24;58:2
**type (2)**
37:6;38:23
**types (2)**
8:13;32:19
**typically (1)**
21:1

## U

**under (11)**
30:23;31:8;33:4;
35:18;60:10;65:16;
66:20;78:16;82:14;
83:25;84:25
**undertake (1)**
36:9
**underway (1)**
50:18
**units (3)**
37:8,8,12
**unknown (2)**
12:14,14
**unless (2)**
56:8;59:23
**unpack (1)**
84:2
**unpaid (1)**
21:4
**unsecured (3)**
12:7;16:17;82:13
**up (16)**
11:6,11;13:13;
30:17;33:9;46:6;
52:20;57:11,14;
58:12,16;64:5;75:18;
79:1,8,25
**upon (4)**
28:9;52:2;71:13;
72:9
**used (5)**
18:4;33:9;67:22;
83:23;84:3
**using (1)**
55:17
**usual (4)**
13:15;18:21;22:3;
54:9
**usually (2)**
12:21;53:24

## V

**valuation (2)**
14:9;38:23
**valuations (1)**
81:6
**value (3)**
21:16;28:11;59:23
**values (1)**
27:4
**various (2)**
36:16;84:7
**Vaselka (2)**
64:11,14
**vast (1)**
9:23
**verify (1)**
44:14
**versus (1)**

17:18
**Veselka (5)**
9:3;62:21;63:7,8,22
**visits (1)**
30:3

## W

**walk (1)**
74:10
**Walker (1)**
59:11
**wants (3)**
19:18;56:18;79:24
**washing (1)**
70:3
**waste (1)**
46:21
**wasted (3)**
46:25;47:1,3
**wasting (5)**
46:19;49:18;77:23;
78:24;79:16
**water (1)**
72:15
**way (10)**
10:1,1;24:13;29:9;
52:21;72:23;73:18;
75:15;84:5,8
**wear (5)**
73:4,23;74:4,7,10
**wearing (3)**
74:13,16,16
**wears (1)**
74:23
**week (2)**
13:9;58:24
**weekend (1)**
74:5
**weeks (2)**
41:24,25
**welcome (2)**
46:25;47:2
**weren't (2)**
45:6,6
**Wes (2)**
25:10;44:19
**What's (13)**
4:7;10:9;13:10;
15:5,13,17;18:1,15;
22:10;30:8;75:3;
78:25;82:2
**whatsoever (1)**
79:2
**wheel (3)**
72:8,21,22
**When's (2)**
13:6;19:25
**whisper (3)**
47:5,7;48:1,24
**whispering (1)**
45:12
**Wild (1)**

71:10
**within (9)**
25:1;27:17;30:1;
32:14;59:17,22;60:5,
22;72:19
**without (1)**
74:12
**witness (11)**
46:6,18;48:10;49:4,
19;66:8;75:18;76:12,
16;77:15,21
**words (1)**
7:18
**work (7)**
4:11;32:23;46:16;
50:9,16,17;52:3
**worked (3)**
20:3;21:17;31:20
**working (4)**
24:15;36:12;40:9,
22
**works (1)**
12:19
**worries (1)**
29:13
**worry (1)**
67:14
**writes (1)**
61:24
**written (2)**
70:7,7
**wrong (5)**
48:11;64:6,14,18;
75:11
**wrote (1)**
68:12

## Y

**year (15)**
9:3;10:16;16:7;
18:8;28:14;32:25;
34:12,21;52:4;55:11;
58:4;60:23;69:4,10;
85:2
**years (4)**
12:23;34:4;81:25;
82:3
**yesterday (1)**
37:1

## Z

**zero (6)**
14:4;16:18,22;
17:12,14;41:10
**zeroed (2)**
14:1,7

## 1

**1 (14)**
5:2,4,7,9,9,18,20;

11:23;12:2;29:4,6;
36:1;38:7;55:22
**1:03 (1)**
55:9
**10 (2)**
19:22;53:7
**10,400 (1)**
27:12
**10,588 (1)**
57:14
**11 (7)**
12:24;35:18;36:12;
52:3;68:1;83:3;84:6
**1191d (2)**
78:10,16
**12 (3)**
58:12;82:12;83:3
**12:56 (1)**
55:9
**13 (5)**
5:4,12,17,25;57:6
**13th (1)**
57:12
**14 (3)**
25:25;53:10;65:10
**14th (5)**
19:1;36:4,10;40:5,8
**15th (1)**
37:1
**16 (3)**
6:1;8:4;54:25
**185 (2)**
72:3,20
**19 (6)**
12:5;40:9,11;50:8;
53:7;54:25
**1st (1)**
37:25

## 2

**2 (5)**
6:8;12:2;59:15;
60:10;68:7
**2.1 (1)**
23:1
**2.2 (1)**
13:16
**2:05 (1)**
85:10
**20 (2)**
10:24;17:21
**2004 (1)**
5:22
**200-odd (1)**
83:15
**2013 (2)**
53:17,20
**2018 (7)**
9:4;22;22:14;55:13;
63:9;66:19;69:5
**2019 (10)**
9:7;15,19,22,24;

10:24;14:16,17;
16:11;22:16
**2020 (35)**
9:17;10:12,13,15;
12:18;13:2,7;14:1,14;
15:7;20:4;21:2,12,14,
16,17;28:14,21,25;
31:4,9;32:25;34:6,12;
38:10,14,16,19,25;
39:1,2;52:4,5;61:22,
25
**2021 (23)**
14:20;21:8;26:1;
34:16;36:5;38:3,15;
41:15,22;42:14;43:8,
16,19;44:5,7,10;
53:10;55:22;56:25;
57:7,20,21;58:12
**23 (1)**
61:22
**24 (5)**
22:25;23:1,5,7;53:8
**25 (8)**
41:14,22;42:14;
43:8,16,19;44:10;
69:5
**25th (2)**
41:23;43:24
**26,000 (1)**
30:13
**28 (4)**
55:18,21;59:14;
60:10

---

**3**

**3 (26)**
6:8;7:6,22;11:20,
21;12:2,2;17:21;23:1;
29:4,5,6,6,8;40:9,11;
55:15,17,21;59:14;
60:10,11;72:6;82:13,
16,21
**3.4 (1)**
17:21
**30 (2)**
40:5,8
**30-plus (1)**
10:10
**30th (2)**
36:4,10
**31 (3)**
56:23;57:16;60:4
**35 (1)**
41:6
**37 (9)**
12:2,5;23:1,5,7;
55:19,21;59:14;60:10
**37,5 (1)**
53:25
**38 (4)**
61:15,16,17,18

---

**4**

**4 (7)**
6:8;12:2;24:19,21;
25:2;36:4;50:8
**42 (1)**
50:7

---

**5**

**5 (7)**
6:8;29:5,6,8;40:1;
57:17,23
**50/50 (1)**
4:18
**502 (1)**
82:14
**50380 (1)**
29:2
**53 (6)**
62:17,18,19;63:10;
64:15;66:19
**5th (1)**
57:13

---

**6**

**6 (6)**
6:8;51:23;58:19;
67:23,25,25
**60 (2)**
81:23;82:11

---

**7**

**7 (18)**
40:13;57:17,23;
58:19;62:23;63:12;
64:15;65:10,16;66:1,
2;75:2,12,13;76:20,
23;77:18,19
**740,715 (1)**
28:2

---

**8**

**8 (6)**
35:12,14,17;40:11;
50:8;82:12
**80- (1)**
33:3
**82- (1)**
33:22
**82,000 (1)**
33:22

---

**9**

**90 (4)**
59:17,22;60:6;
62:12